CENTRAL TRUST CO. OF NEW YORK *v.* MARIETTA & N. G. RY. CO.,
(HIAWASSEE CO., Intervener.)

*(Circuit Court of Appeals, Fifth Circuit. December 7, 1891.)*

1. APPEALABLE ORDER—DECISION ON CLAIM OF INTERVENER.
    The decision of a circuit court, on a petition of intervention in a foreclosure suit, sustaining the intervener's claim, is a "final decision," within Act Cong. March 3, 1891, c. 517, § 6, giving the circuit courts of appeals jurisdiction to review final decisions of the circuit courts.
2. FORECLOSURE OF RAILROAD MORTGAGE—CLAIMS OF INTERVENER—CONDITIONAL SALE —ESTOPPEL.
    An improvement company, interested in the construction of a railroad, and whose president was a stockholder in the railroad company and largely interested as a contractor in the construction of the railroad, equipped the railroad with rolling stock, and caused the same to be marked with the name of the railroad company; the intent of the improvement company being to enable the railroad company to issue certain bonds, secured by mortgage on its railroad as an equipped railroad, and such bonds were issued and placed through the instrumentality of the president of the improvement company. In a suit by a holder of the bonds to foreclose such mortgage, an assignee of the improvement company intervened, claiming the rolling stock. *Held*, that the improvement company and its assignee were estopped to allege that the transaction in question constituted a gratuitous loan of the rolling stock, or to deny the title of the railway company thereto as against plaintiff.
    48 Fed. Rep. 32, reversed.

Appeal from the Circuit Court of the United States for the Northern District of Georgia.

Bill in equity by the Central Trust Company of New York against the Marietta & North Georgia Railway Company, to foreclose a mortgage made by the railroad company. The Hiawassee Company intervened, claiming title to certain rolling stock in the possession of the receiver appointed in the suit. Decree for intervener. Plaintiff appeals. Reversed.

Act Cong. March 3, 1891, c. 517, § 6, provides that the circuit courts of appeals established by the act shall exercise appellate jurisdiction to review any "final decision" in the district court and circuit courts, in all cases except as otherwise provided.

### STATEMENT BY PARDEE, J.

On the 17th March, 1891, the Hiawassee Company filed a petition, as an intervention, in the suit of Central Trust Company of New York v. Marietta & North Georgia Railway Company, for the foreclosure of mortgage, pending in the circuit court of the United States for the northern district of Georgia, wherein a receiver had been appointed and put in possession of the railway property. Intervener claimed certain railway equipment, then in possession of J. B. Glover, receiver of the Marietta & North Georgia Railway, as follows: One Brooks locomotive, shop No. 5, railroad No. 13; four Baldwin locomotives, Nos. 11, 12, 14, and 15; two combination mail, baggage, and express cars, Nos. 11 and 12; two first-class passenger-cars, Nos. 13 and 14. This petition was demurred to by Central Trust Company of New York, and thereupon was amended on 28th March, 1891, making the claim as follows:

"The property described and claimed by it was purchased by the North Georgia Improvement Company from original owners. It was placed upon the line of the M. & N. G. R. R. Company by the North Georgia Improvement Company, through the instrumentality of Geo. R. Eager, who was largely interested in both companies, but without any contract of purchase or lease by the M. & N. G. R. R. Company, and nothing has been paid on the same by said railroad company, nor has it any claim of any kind on said property. The right of possession to all of said property is in the Hiawassee Company, and the title to all of said property has vested in it, except the title to engines Nos. 14 and 15. These engines were bought from Burnham, Parry, Williams & Co. All of the purchase money has been paid on the same except six notes dated May 30, '89, for $818.00 each, due, respectively, 17, 20, 21, 22, 23, and 24 months from date. Upon the payment of these notes the title to said engines also will vest in the Hiawassee Company."

It is to be noted that the intervener, in its amended petition, alleges the title to two of the locomotives, Nos. 14 and 15, is in Burnham, Parry, Williams & Co. The intervention, without being put in issue, having been referred to a special master in chancery, the testimony of George R. Eager and J. B. Glover, receiver, was taken. This testimony, together with exhibits introduced by intervener, shows substantially the following facts: That George R. Eager was the contractor to build the Marietta & North Georgia Railway; that he was also the president and a

large stockholder in a company organized under the laws of New Hampshire, known as the North Georgia Improvement Company, with its headquarters in Boston, Mass.; that said Eager, as contractor, was to receive stock and bonds of the Marietta & North Georgia Railway for its construction; that said Eager procured the North Georgia Improvement Company to purchase and pay for the whole equipment hereinbefore stated, except the sum of $4,908, the balance due Burnham, Parry, Williams & Co., of Philadelphia, for engines Nos. 14 and 15, which amount was evidenced by six notes outstanding, not produced at the hearing of the cause, presumably in the hands of the payees; and that the Hiawassee Company was organized under the laws of Maine, and was, among other things, authorized to invest in stocks, bonds, and real estate; that the said equipment was purchased from various original vendors, was marked in name of said Marietta & North Georgia Railway Company, and put in the possession, custody, and control of said company, the Marietta & North Georgia Railway Company, by said Eager, contractor and president, as aforesaid; that by the writings executed by Burnham, Parry, Williams & Co. and the North Georgia Improvement Company, the title was reserved until full payment, and the locomotives are stated to be loaned to the lessees, to be used "upon their railroad," etc.; that by writing executed between Jackson & Sharp Company and North Georgia Improvement Company, it is stated that the cars are to be used on the Marietta & North Georgia Railway Company; that for the engine bought from S. W. Groome there was no written agreement; that the Marietta & North Georgia Railway had been in possession of locomotive engines 14 and 15 since about May, 1889, upon which was still due the sum of $4,908 to Burnham, Parry, Williams & Co., represented by six notes still held and owned by them; that the railway company had been in possession of the two first-class passenger-cars, 14 and 15, one combination mail, baggage, and express car, numbered 11, and one combination mail, baggage, and express car, numbered 12, since April 17, 1889, and that said company had been in possession of locomotive engines Nos. 11 and 12 since about 20th day of December, 1888.

George R. Eager testified, as is shown on pages 17 and 18 of the transcript of the record, as follows:

"*Question.* What was your plan, Mr. Eager, in regard to the purchase of this rolling stock? Did you control a majority of the stock of the M. & N. G. Ry.? *Answer.* Yes; I and my friends controlled three-fourths of it. *Q.* What was your plan with regard to this rolling stock,—in regard to the future? *A.* Our plan was, when we got the road fully completed, it would improve our mines, and we bought as much rolling stock as we should want for the immediate present; that we would endeavor to arrange equipment, and issue equipment bonds for sufficient amount to cover all the rolling stock, and to secure all the rolling stock we thought it would be necessary to have. *Q.* Up to this time no contract between the M. & N. G. Ry. and the North Georgia Improvement Company was made? *A.* No, sir; none whatever. *Q.* Was there any agreement, verbal or otherwise, between the improvement company and the railway company as to the improvement company furnishing stock to the railway company? *A.* No, sir; no agreement in any shape.

The rolling stock was sent down there with the idea that the railway company very soon would be done, and would make a car trust,—get somebody to let them have money, and make a car trust."

It further appeared from the exhibits introduced—*First*, that Burnham, Parry, Williams & Co., of Philadelphia, had contracted with the North Georgia Improvement Company concerning the two locomotives, 14 and 15, whereby the title was reserved until they were paid for; but this contract, although dated 13th May, 1889, was not proved until the 19th January, 1891, and was never recorded at all; *second*, that on the 27th day of January, 1891, more than a week after the Marietta & North Georgia Railway was placed in the hands of the receiver, the North Georgia Improvement Company executed a paper purporting to be an absolute sale to the Hiawassee Company of all the railway equipment hereinbefore set forth.

On this testimony the special master found in favor of the interveners, as follows:

"I do therefore respectfully report that the intervener, the Hiawassee Company, has a valid claim and title to all of said property, except to Nos. 14 and 15 Baldwin locomotives, and upon payment of the balance due on said two locomotives will have a valid title to them; and that the present value of all said rolling stock, including interest at six per cent., calculated up to April 7, 1891, is $64,653.03. I further report that said rolling stock is absolutely necessary to the operation of the said Marietta & North Georgia Railway, and that it is advisable that the receiver be allowed to purchase all of said rolling stock at the sum of $64,653.03; that the said outstanding notes for Baldwin locomotives Nos. 14 and 15 be paid out of this amount."

To this report exceptions were duly filed, which, on hearing, the court ordered—

"(1) That the case be resubmitted to the master, to take evidence and report upon the question of the value of the equipment mentioned in said intervention on the 19th of January, 1891, when the receiver was appointed. (2) To take evidence and report upon the relations existing between the Marietta and North Georgia Railway Company and the North Georgia Improvement Company, by contract or otherwise, and the relations existing between said two companies and George R. Eager, and the relations existing between said two companies and said Eager and the Hiawassee Company, so far as they throw light upon or affect this case."

After the first hearing before the master, and prior to a second hearing, the Central Trust Company filed in the court certain answers, setting up defense substantially as follows: (1) A general denial of the statements made in the original and amended intervention. (2) Averment as to the appointment of receiver on 19th January, 1891, and that Burnham, Parry, Williams & Co. were still due the sum of $4,908, balance upon two locomotives, Nos. 14 and 15, and that the North Georgia Improvement Company had paid in full to parties from whom it was purchased for all the other equipment mentioned in said petitions. That upon such payment full right and title to said equipment vested in said Marietta & North Georgia Railway Company, without any lien or reservation of title on the part of the North Georgia Improvement Company; and that, if any sum was due for such equipment, so paid

for by said North Georgia Improvement Company, it was only an open account debt, and that said equipment was purchased by said North Georgia Improvement Company, and placed in the possession and control of said Marietta & North Georgia Railway Company for its special use and benefit, and became and was subject to the lien of the mortgage now being foreclosed. (3) Setting forth that the North Georgia Improvement Company on the 27th of January, 1891, undertook to sell and to convey to the Hiawassee Company said equipment, and controverting the right of said improvement company to make such sale as to the two locomotives 14 and 15, because the title was in Burnham, Parry, Williams & Co. as to them, and as to the other equipment, because, it having been fully paid for by the North Georgia Improvement Company, the title was in the Marietta & North Georgia Railway Company. (4) That when the Hiawassee Company, on the 27th of January, 1891, accepted from the North Georgia Improvement Company the writing undertaking to convey the title to said equipment, said Hiawassee Company knew, or was bound to know, all that the North Georgia Improvement Company, or its officers, knew in relation to said equipment. (5) That George R. Eager negotiated for all of said equipment, and at the time was president of the North Georgia Improvement Company, and was a very large stockholder and controlling spirit therein, and had absolute control of said company in every way; and that the deed of trust securing the bonds of said railway, delivered to said Eager, as contractor, recited that they were for the purpose of improving, completing, and equipping said railway. (6) That the information and knowledge of Eager, contractor, as to the purchase of said equipment, was legal and actual notice to the North Georgia Improvement Company. (7) That the title to the two locomotives, 14 and 15, was in Burnham, Parry, Williams & Co., etc. (8) That the title to the remainder of said equipment, having been paid for by the North Georgia Improvement Company, was in the Marietta & North Georgia Railway Company, etc. And, further, that the Hiawassee Company is composed of stockholders who hold claims and debts due to them by the North Georgia Improvement Company, and occupy intimate and confidential relations with said company, and as such they were put upon notice and bound to know the relations existing between Eager, the North Georgia Improvement Company, and the Marietta & North Georgia Railway Company. (9) Calling attention to the provisions in the deed of trust now being foreclosed, as to how the bonds should be issued, and that the railway should be constructed and equipped out of the proceeds of said bonds, etc. (10) That the North Georgia Improvement Company or Eager caused said equipment to be delivered to the Marietta & North Georgia Railway, as Eager, as contractor, was in duty bound to do, and without any reservation and title thereto, and thereupon Eager procured the Marietta & North Georgia Railway Company to execute, in accordance with the mortgage now being foreclosed, certificate, or certificates, that the railway had been completed and equipped, to the extent to authorize the issuing of said bonds, which certificate Eager caused to be deliv-

ered to Central Trust Company of New York, and .thereupon procured the issue by said Central Trust Company to Eager, as contractor, of the bonds of said Marietta & North Georgia Railway Company.

Upon the resubmission, the only witness examined in this intervention was J. B. Glover, the receiver, whose testimony shows substantially as follows: That all the railway equipment set forth in the Hiawassee intervention was placed upon the road by George R. Eager, and marked with the name of the Marietta & North Georgia Railway Company, and went into the custody, control, and use of said railway, the same being received by said Glover, who was then superintendent of said railway. That at that time Eager was the contractor, building part of the Marietta & North Georgia Railway, and broadening the gauge of other parts.  Eager was the chief stockholder in said railway, was the president and general controller of the North Georgia Improvement Company, and his sister, H. A. Eager, was treasurer, with headquarters at Boston, Mass. That in addition to the duties of superintendent of the railway, said Glover was the agent of Eager, receiving a salary of $75 a month.  That, as the line of railway was constructed, the North Georgia Improvement Company paid many of the bills due for such construction.  That the North Georgia Improvement Company would frequently furnish to Glover, as agent of Eager, money with which to pay claims due laborers under Eager, as contractor, and also freight on rolling stock coming to the North Georgia Improvement Company or to Eager, and which Eager caused to be placed on the Marietta & North Georgia Railway.  That whenever the Marietta & North Georgia Railway would pay claims against Eager, contractor, or against the North Georgia Improvement Company, Glover, as agent for Eager, would then send the bills to H. A. Eager, treasurer of the North Georgia Improvement Company, at Boston.  That if there was any charge for freight upon locomotive or passenger equipment consigned to or received by the Marietta & North Georgia Railway, a charge would be made up against George R. Eager, and sent to H. A. Eager, treasurer of the North Georgia Improvement Company, and that drafts would be drawn on H. A. Eager, as such treasurer, to settle these accounts, and the vouchers would be sent to her.  That there were three ways that Glover, as agent for Eager, obtained money for claims due laborers for construction or for freight upon the railway equipment furnished the Marietta & North Georgia Railway: (1) By drawing on H. A. Eager, treasurer; (2) by checks drawn by George R. Eager upon some bank in Boston or New York; (3) by drafts drawn by George R. Eager on H. A. Eager, treasurer,—that is, whatever was paid out of the funds of the Marietta & North Georgia Railway Company by Glover, as superintendent, for debts due by George R. Eager, as contractor, or for debts due by George R. Eager or the North Georgia Improvement Company for freight on railway equipment sent to the Marietta & North Georgia Railway, was reimbursed in one of the three ways above mentioned.  That George R. Eager was contractor, not only to build and widen the gauge of the Marietta & North Georgia Railway in the states of Georgia and North Carolina, but he was at the same time

contractor to build the Knoxville Southern Railroad, then being constructed in the state of Tennessee, and which was afterwards consolidated with the Marietta & North Georgia Railway, under that name.

There was also introduced on said second hearing documentary evidence, to-wit:

"This is to certify that the Marietta & North Georgia Railway has been completed ——— miles, and is now ready for operation ——— miles of the same between ——— and ———, and that there has been delivered and in good working order upon said railway an amount of rolling stock and equipment bearing the same proportion to the whole rolling stock and equipment requisite for the proper and efficient working of the railway as the number of miles completed at the date of this certificate bears to the total mileage of said railway, and that the stations included in the sections herein certified have been fully and completely equipped with all usual and necessary apparatus, appliances, and furniture."

An agreement was made on 25th August, 1888, between Hambro & Son, of England, Marietta & North Georgia Railway Company, George R. Eager, contractor, and Knoxville, Cumberland Gap & Louisville Railway Company, whereby the said Hambro & Son were, among other things, to place $1,000,000 of the consolidated mortgage bonds of the Marietta & North Georgia Railway Company, now being foreclosed in the main suit, upon certain terms, conditions, promises, and agreements set forth in said contract. This agreement was signed by George R. Eager, as general manager for the Marietta & North Georgia Railway Company, and by George R. Eager, contractor, and by George R. Eager as general manager of the Knoxville, Cumberland Gap & Louisville Railroad, and for the Cumberland Gap Construction Company. Further, there was an indorsement upon this contract by which George R. Eager signed his own name, and also signed as attorney in fact for Royal M. Pulsifer, and guarantied that the contract between Hambro & Son and others should be carried into effect, and the completion of the Marietta & North Georgia Railway assured, by Eager and Pulsifer, at their own cost and expense, if the proceeds of the sale of the mortgage bonds were not sufficient for the purpose. This contract recites "that it has been agreed, for the purposes of this agreement, completed sections shall consist of not less than five miles, with the corresponding proportion of rolling stock and equipment;" and therein it is agreed by the Marietta & North Georgia Railway Company that no certificate of completion shall be given until there shall be delivered and in good working order an amount of rolling stock, etc. This contract and agreement also had attached to it authority from the Marietta & North Georgia Railway Company, giving George R. Eager the power to enter into such agreement with Hambro & Son; and it appears that thereafter the form of the certificate was changed so as to show completed sections fully equipped with rolling stock. Also three separate contracts and agreements: (1) Contract made between the Marietta & North Georgia Railway Company by Joseph Kinsey, its president, and George R. Eager, whereby Eager was employed as contractor to do certain work on that railroad, and the company was to furnish certain convicts and make certain payments to Eager. This contemplated

only a narrow-gauge road.   (2) Agreement between Eager and the Marietta & North Georgia Railway Company, made on the 4th of August, 1881, whereby Eager was employed as contractor to build certain line of railroad for said company.   (3) Another contract between George R. Eager and the Marietta & North Georgia Railway Company, whereby Eager was to broaden the gauge of the said line of railway, was to put down steel rails not lighter than 56 pounds to the yard, and was to do other things therein set forth, upon the consideration of receiving certain bonds and stock and $3,000 a mile in cash.   In said contract the following language is used:

"The party of the first part agrees, [that is, George R. Eager,] whenever requested to do so by the party of the second part, to survey and lay out its road or roads as hereinbefore agreed to be constructed and equipped, and to acquire by purchase, condemnation, or otherwise, such rights of way," etc.

There was also used at the hearing of the intervention of the Hiawassee Company, under the agreement of counsel, the testimony of C. R. Walton, chief engineer of the Marietta & North Georgia Railway Company, which testimony is substantially as follows:   That he was chief engineer of the Marietta & North Georgia Railway Company, and the officer of that road who sent on the certificates, as the road was completed, to the Central Trust Company of New York.   That there were 20 of these certificates which were forwarded to Royal M. Pulsifer, president of the railway company, Walton, as chief engineer, having made one copy of such certificates, and forwarded to Pulsifer, and another copy handed to Hammett, secretary of the company at Marietta.   That the said certificate was as follows:

"This is to certify that the Marietta & North Georgia Railway Company have completed and in operation one hundred and eleven fifty-two one-hundredths miles of railroad between Marietta, Ga., and Murphy, North Carolina. C. R. WALTON, Chief Engineer."

This was addressed to the Central Trust Company of New York.   The first was, in substance, like the second, except in mileage; being for 99 miles.   The first certificate was dated June 17, 1887, and the second May 19, 1888.   That the certificates, after the first two sent by him, as chief engineer, to the Central Trust Company of New York, contained the following language:

"And there has been delivered and in good working order upon said railway an amount of rolling stock and equipment requisite for the proper and efficient working of the railway, as the number of miles completed at the date of this certificate bears to the total mileage of said railway."

—And that this form of certificate was used in order to get bonds on that portion of the road lying between Blue Ridge and Knoxville, Tenn., as well as on the other parts of the line.   That the form of certificate was adopted unanimously by the board of directors on the 8th of April, 1889, as the form to be signed by him as chief engineer, and that such form, so adopted by the board of directors, he continued to send to Central Trust Company, and upon which the bonds were obtained.

It was conceded at the hearing before the court that the mortgage or

deed of trust given by the Marietta & North Georgia Railway Company to Central Trust Company of New York, under which bonds were issued upon certificates of completion and equipment, contained the following:

"And whereas, the said party of the first part is desirous of borrowing money for the purpose of paying off and discharging all of said mortgage indebtedness of said Marietta & North Georgia Railway Company, and for the further purpose of constructing, improving, extending, completing, and equipping its railway, and proposes, in conformity with the laws of said states, to issue its bonds therefor, and to secure the payment of the same by the mortgage of its railway, equipment, and franchise, and all of its other property, whether now in possession or hereafter acquired."

—And that the said mortgage or deed of trust covered all after-acquired property appurtenant to the railroad and its branches.

It further appeared in evidence that about the times the certificates of completed sections, with rolling-stock equipment, were made, other (besides the ones in question here) conditional purchases of rolling stock were negotiated by Eager and the North Georgia Improvement Company, resulting in rolling stock being placed upon the Marietta & North Georgia Railway, to justify the certificates, and that of all the rolling stock found on the Marietta & North Georgia Railway, 231 miles long, at the time the receiver was appointed, outside parties claimed the ownership, except of two locomotives. By agreement, a report of a meeting of bondholders of the Marietta & North Georgia Railway Company, for reorganization purposes, held after the appointment of a receiver, was put in evidence, showing the adoption of a report of a committee, of which George R. Eager was one, recommending the purchase of rolling stock in use on the railway; special care to be taken that the railroad shall acquire a perfect title to the property,—amount stated at $291,933.

The second report of the master was substantially as follows:

"(1) As to the value of said rolling stock on the 19th January, 1891, the master found the total aggregate value of the same to be $55,993.59, to which should be added interest at the rate of 7 per cent. per annum from the 19th January, 1891.

"(2) The evidence shows that the North Georgia Improvement Company in 1888 and 1889 bought all of this rolling stock, and placed the same on the Marietta & North Georgia Railway Company. The contract between the North Georgia Improvement Company and the original owners of said rolling stock was in writing; the contract in each case being a conditional sale, with title reserved until fully paid for. These contracts were all duly executed, but none of them have ever been recorded. The North Georgia Improvement Company placed all of said rolling stock on said Marietta & North Georgia Railway, without any contract or agreement, either oral or written, with said company. The evidence shows that the North Georgia Improvement Company has fully paid for all of said rolling stock, except six notes, aggregating $4,908, payable to Burnham, Parry, Williams & Co. The proof shows that the North Georgia Improvement Company, on the 27th day of January, 1891, duly transferred and assigned all its right, title, and interest in and to said rolling stock to the Hiawassee Company, the intervener in this case. The master is of the opinion that these contracts, reserving title between the original owners and the North Georgia Improvement Company, are good except as to subsequent purchasers or creditors without notice; and, when the

North Georgia Improvement Company had fully paid for said rolling stock, it acquired a valid title, which it could legally transfer. The master is of opinion that, when said rolling stock was placed on said Marietta & North Georgia Railway without any contract, the legal effect was to create a bailment, subject to the termination at option of either party, and that therefore this property was held by the Marietta & North Georgia Railway Company as bailee. Counsel for the Central Trust Company further contend that George R. Eager was under written contract to equip said railway with rolling stock; that said Eager was really the North Georgia Improvement Company; and that, when said company placed said rolling stock upon said railway, it did so in pursuance of said Eager's contract to equip said railway, and therefore it became the property of said railway, and became subject to the mortgage executed by said railway to secure the payment of its bonds. The master does not think that this position is sustained by the evidence. In his opinion, a careful examination of the contract made between Eager and the railway company, the original railroad company, the certificates of C. R. Walton, chief engineer, the contract with Hambro & Son, of London, will show that George R. Eager was not to equip the road with rolling stock. In the opinion of the master, the intervener, the Hiawassee Company, has a valid title to all of said rolling stock, and has a good title to all of said property, except as to Nos. 14 and 15, Baldwin locomotives, upon which there is still due the sum of $4,908. The evidence shows that this rolling stock is essential to the operation of the railway by the receiver, and I therefore recommend that he be authorized to purchase the same at its value on the 19th of January, 1891, with 7 per cent. per annum interest from said date; the $4,908 balance due to be included in the amount. As to the ability of the receiver to pay cash for this rolling stock, the master refers to his report filed on June 6th, in the intervention of Samuel W. Groome.

"(3) The master finds that George R. Eager was and is the largest stockholder in the Marietta & North Georgia Railway Company, and that he was the contractor to construct said railway; that said George R. Eager was, until recently, president of the North Georgia Improvement Company. The evidence further shows that the only relation existing between the Marietta & North Georgia Railway Company and the North Georgia Improvement Company, by contract or otherwise, was in reference to this rolling stock, and, in opinion of the master, was that of bailor and bailee. The evidence does not show any connection between said two companies and George R. Eager and the Hiawassee Company, except the transfer by the said North Georgia Improvement Company to the said Hiawassee Company of all its right, title, and interest to the rolling stock covered by this intervention."

The Central Trust Company filed elaborate exceptions to the master's report, mainly on the line of the answer hereinbefore given in substance; the important ones being as follows:

"Because it is shown by the evidence that there was nothing whatever due by the North Georgia Improvement Company to the original vendor for the aforesaid property, except $4,908, due to Burnham, Parry, Williams & Co. as a balance upon locomotives 14 and 15, and that there was no reservation of title or lien upon these locomotives by the original vendor, or any one else, as against the Marietta & North Georgia Railway Company, but that all of said property has been paid for, except as above stated, and had been placed by George R. Eager, president of the North Georgia Improvement Company, upon the Marietta & North Georgia Railway Company, three-fourths of the stock of which he and his friends control, with the distinct understanding, at the time that said rolling stock was placed upon said line of railway, and that the railway company was thereafter to pay the said North Georgia Improve-

ment Company for the same by issuing equipment bonds; but that the said understanding was only on the part of the said Eager, as president of said improvement company, and without any contract or agreement to the effect being agreed to on the part of the railway company, who took said rolling stock, and used it as its own, unincumbered by any reservation of title or any contract other than the law implies to pay for the same.

"Because the special master did not find and report that George R. Eager, the contractor to build the Marietta & North Georgia Railway, was under obligation to adequately equip said railway with rolling stock; and further. because said special master did not find and report that the relations between said George R. Eager, contractor, and as president of the North Georgia Improvement Company, and as controlling more than three-fourths of the stock of the said Marietta & North Georgia Railway Company, was such that any debt and demand due to the Hiawassee Company by the Marietta & North Georgia Railway Company grounded upon rolling stock furnished said railway company, and paid for by said North Georgia Improvement Company, should not again be paid for to the Hiawassee Company; but that such claim of the Hiawassee Company was void and invalid against said railway company, because of the relations existing between that company, George R. Eager, the North Georgia Improvement Company, and the Marietta & North Georgia Railway Company."

The court on hearing having overruled the exceptions and confirmed the master's report, and having further rendered final decision that the receiver should purchase the railroad equipment mentioned in the intervention, by giving notes due in six months from date, with interest at 7 per cent. per annum from January 19, 1891, the Central Trust Company appealed to this court, assigning, substantially, as error the same points made in the answer and in the exceptions to the master's report. On the hearing in this court counsel for appellee filed a motion to dismiss the appeal on the ground of prematurity, no final decision having been rendered in the main case pending in the court below.

*H. B. Tompkins,* for appellant.

*Hoke Smith,* for appellee.

Before PARDEE, Circuit Judge, and LOCKE and BRUCE, District Judges.

PARDEE, J., (*after stating the case.*)   The decision in the court below on the intervention of the Hiawassee Company was a final decision upon the matter distinct from the general subject in litigation.   *Central Trust Co.* v. *Grant Locomotive Works,* 135 U. S. 207, 10 Sup. Ct. Rep. 736. As a final decision, it comes directly within the jurisdiction given to the circuit courts of appeal in the sixth section of the act, approved March 3, 1891, entitled "An act to establish circuit courts of appeal," etc.   While perhaps the court may, for its own protection, hereafter be compelled to insist that causes pending in the circuit and district courts shall not be brought to this court for review piecemeal, we are not inclined to enforce such a rule in this case, even if we have authority so to do.   The motion to dismiss the appeal will therefore be overruled.

The mortgage given by the Marietta & North Georgia Railway Company, suit for foreclosure of which is now pending in the court below, covers fully all after-acquired property appurtenant to the railway, and it

contemplated that a fully constructed and equipped railroad should be provided with the proceeds of the bonds. Apparently, however, all the bonds, or the proceeds thereof, under contracts thereto made, were to go to the contractor, who was not in terms, and perhaps not by implication, bound to equip the road. The Hambro agreement more fully and explicitly provided for an equipped railroad. Apparently the process of issuing the bonds upon certificates of a completed road-way ready for the passage of trains was not satisfactory, and the agreement expressly recites:

"It has been agreed for the purposes of this agreement completed sections shall consist of not less than five miles, with a corresponding proportion of rolling stock and equipment."

—And then provides as follows:

"The Marietta & North Georgia Railway Company undertakes and agrees that on and from the date of this agreement every section of completed railway, the subject of every sworn certificate, as aforesaid, shall for the purpose of this agreement comprise not less than five miles of railway; and that no such sworn certificate shall be given unless and until there shall be delivered in good working order upon the said railway an amount of rolling stock and equipment bearing the same proportion to the whole rolling stock and equipment requisite for the proper and efficient working of the railway as the number of miles completed at the date of such certificate shall bear to the total mileage of said railway."

It is to be noticed here that Eager acted for the companies in making the contract, and was a party himself thereto as the contractor.

The Marietta & North Georgia Railway Company had previously in the fullest manner authorized Eager to contract with Hambro & Son for issue and sale of the bonds,—price, terms, and commissions at Eager's discretion; and the railway company immediately ratified the contract by directing that thereafter the form of certificate to the trust company, upon which bonds were to issue, should be as provided therein, and from that date every certificate upon which bonds were issued by the trust company to the contractor or his assigns, for constructing the railroad, contained the statement—

"That there had been delivered, and in good working order, upon said railway an amount of rolling stock and equipment bearing the same proportion to the whole rolling stock and equipment requisite for the proper and efficient working of the railway as the number of miles completed at the date of this certificate bears to the total mileage of said railway."

The Hambro contract that rolling stock and equipment should be delivered upon the road in good working order and in requisite quantity for the proper and efficient working of the railway evidently contemplated that the rolling stock and equipment so delivered should be rolling stock and equipment belonging to the road by some title of ownership, so as to make the same a better security for the bonds than the railroad without rolling stock and equipment would be. Therefore, the agreement precluded a mere temporary gratuitous loan of the rolling stock for the purposes of the certificate. Eager was the contractor constructing the railroad, and, while he had not in terms bound himself as

contractor to furnish the railway with rolling-stock equipment, (only the company so binding itself,) yet Eager, under the terms of the Hambro contract, could obtain no bonds for construction until the rolling stock should be delivered in good working order and in requisite quantity upon the road. The North Georgia Improvement Company, a New Hampshire corporation, owning mining interests along the line of the road, and to some extent a holder of the bonds of the railway, of which company Eager was president and general manager, through Eager, bought the rolling stock in question, and delivered it upon the railroad and had it marked in the name of the railway, as though it was the property of said railway, and the same went by consent of all parties into the custody and control of said railway.

The question for our determination is whether the transfer of the rolling stock, made as aforesaid, was a mere temporary gratuitous loan or sale. As Eager negotiated the whole business for the improvement company, and was the president of the improvement company and the apparent controller of the railway company, the question is reduced to this: Did Eager intend a temporary gratuitous loan or a sale? The elements of a sale—the thing, the price, delivery—are there; and the sale was complete if there was the necessary consent. As recited in the statement of facts, Eager testifies in relation to this matter:

"Our plan was when we got the road fully completed it would improve our mines, and we bought as much rolling stock as we should want for the immediate present; that we would endeavor to arrange equipment and issue equipment bonds for sufficient amount to cover all the rolling stock, and secure all the rolling stock we thought it would be necessary to have."

Again:

"The rolling stock was sent down there with the idea that the railway company very soon would be done, and would make a car trust,—get somebody to let them have money, and make a car trust."

This evidence shows that it was contemplated by Eager that the Marietta & North Georgia Railway Company was to have and keep the rolling stock, and was to pay for it thereafter either by raising money on equipment bonds or through a car trust. The destination and the future use and control of the rolling stock was thus fixed in the Marietta & North Georgia Railway Company, and that by the consent of all the parties. When, in addition to this, it is considered that upon a delivery with apparent title in the railway company of such rolling stock, the bonds of the railway company were to be and were issued, of which Eager was a beneficiary, in the light of honest dealing can any other conclusion be reached than that Eager, acting for all parties, (himself included,) intended a sale of the rolling stock to the railway company, rather than a temporary gratuitous loan, which would have operated a fraud upon the persons dealing in bonds on the faith of the Hambro agreement?

Counsel for appellee urges several points in this connection,—that, as under the Hambro agreement, the rolling stock was only to be delivered upon the railroad, and was not required to be owned by the railway

company, and as Hambro & Son knew that Eager was not bound under his contract for construction to furnish equipment, and understood that the money from the bonds would not pay for equipment, therefore it was not contemplated that the railway company should be the owner of the rolling stock, but that it had the right to furnish equipment through a car trust.

The answer to this seems plain, so far as rolling stock in issue in this intervention is concerned. The railway company did not create a car trust, but it took the property as apparent owner. It is further urged that, when the receiver was appointed in the main suit, in his first report he declared this rolling stock to be owned by the persons now claiming it, and that subsequently to such report the bondholders held a meeting, and elected a committee of five to represent them in connection with the management of the road; and that this committee reported "with regard to the 15th item, rolling stock now in use, your committee recommend this payment, with the remark that special care be taken that the railway shall acquire a perfect title to property," and that this recommendation was subsequently reported back to a meeting of the bondholders, who indorsed it.

Counsel states, although it does not appear in the evidence, that a representative of Hambro & Son constituted one of the committee, and that on the subsequent vote all of Hambro & Son's bonds were voted in favor of the resolution. It does appear that Eager was one of the committee, and one of the bondholders voting in the affirmative. There is nothing to show that the bondholders were fully advised of the actual state of the rolling stock, and the presumption naturally is raised that they acted in the light of Eager's statement and explanations. Besides this, it is to be noticed that the recommendation of the bondholders is for payment as though the contract of purchase had been completed. It is not to be presumed from what the bondholders did do that there was any intention to subordinate the lien of the mortgage to any claim for equipment.

The case, however, as we understand it, does not require that we should find that there was an actual sale of the rolling stock to the railway company. Under the circumstances, as to the placing of the rolling stock on the railway for use by the railway company apparently as owner, the issuance of bonds by the trust company on certificates, in accordance with the Hambro contract, based upon this rolling stock and the beneficiary result thereof to Eager, both Eager and the North Georgia Improvement Company are estopped in equity from attacking the railway company's title to the rolling stock in question as against the interest of the bondholders. As to Eager, this estoppel ought not to be questioned, and we are of opinion that it is equally clear as to the North Georgia Improvement Company, for it was charged with full notice of all the circumstances as fully as Eager himself was informed, and yet, as a volunteer, aided Eager in obtaining the rolling stock, and in delivering it upon the railroad, which otherwise he might not have been able to do, and thereby obtained the issuance of bonds based on delivery of

the rolling stock on the railroad in good working order, etc. The improvement company occupies the same position as the owner who stands by in silence while another sells his property.

It is conceded that the intervener, the Hiawassee Company, stands in the shoes of the North Georgia Improvement Company, so far as the rolling stock is concerned, and can assert no better title thereto than the improvement company could have asserted had no transfer been made.

These views require the reversal of the decree appealed from, and the remanding of the case to the circuit court, with instructions to dismiss the intervention of the Hiawassee Company, with costs. And it is so ordered.

