CENTRAL TRUST CO. v. CONDON et al.

(Circuit Court of Appeals, Sixth Circuit. March 5, 1895.)

No. 207.

1. CONTRACTS—INTERPRETATION.

One E., in April, 1890, made a contract with the K. Ry. Co. for the construction of its road. The contract was dated back to August, 1887, to cover the time during which a construction company had been engaged in building a part of the road, under a contract which had been assigned to E. The first clause provided that E. agreed to build and complete the road on the designated route, according to specifications. By the second clause E. agreed to furnish the money to pay for right of way and depot grounds, and for legal proceedings necessary to acquire the same, and it was mutually agreed that all works, materials, and plant theretofore constructed, equipped, and provided by either party, then in use about the construction or operation of the road, should be deemed works, materials, and plant provided under the agreement by E., and should be his property. By the third clause the K. Ry. Co. agreed, whenever required by E., to survey and lay out its road, and acquire by purchase or condemnation such rights of way, etc., as were necessary. The fourth and fifth clauses provided that the railway company should execute a mortgage to secure its bonds, or the bonds of any other company taken or used by E. in payment, to the amount of $20,000 per mile, and to pay E. for the railroad construction $20,000 per mile in first mortgage bonds and $20,000 per mile in stock. The last clause provided that the road should be fully constructed, and furnished with all the appurtenances contracted for, before August 13, 1890, but that E. might sooner deliver to the railway company any completed portion of the road, and the same should then be operated by the railway company, E. paying all expenses and receiving all the earnings. *Held*, that this contract did not impose upon E. an obligation to furnish the road with an equipment of rolling stock.

2. SAME—DAMAGES—FAILURE TO DELIVER WORTHLESS STOCK.

E. received a large amount of the stock of the railway company, but less than he was entitled to receive. At the time when he first made a demand for the stock, however, it was worthless. *Held*, that E. was not entitled to any damages for the failure to deliver such stock.

3. SAME—CONSTRUCTION OF RAILROAD.

In order to complete the road within the time limited, and to secure certain stock subscriptions, made conditional upon such completion, E., with the assent of the railway company, constructed a temporary line around a difficult part of the road, and afterwards constructed a part of the permanent line by a more direct route, which required the difficult and slower work. E. received the stipulated rate per mile for the temporary line. *Held*, that E. was entitled to payment and a lien for so much of the permanent line as he completed as it was reasonably worth.

4. SAME.

*Held*, further, that E. was not entitled to extra pay for building cattle guards, water tanks, stop gaps, slides, sidings, or Y's, the same being all parts of the complete construction of the road; nor was he entitled to a lien, under the Tennessee statute (Mill. & V. Code, § 1774), for a steam shovel, purchased by E., and which passed into the possession of the railway company.

5. SAME.

*Held*, further, that E. was entitled to be repaid for expenditures for engineering of the road.

6. SAME—PAYMENT OF INTEREST ON BONDS.

Pursuant to an arrangement between the K. Ry. Co. and the M. Ry. Co., a line owned by the same persons who had projected the K. Ry. Co. as an extension of the M. Ry., bonds of said M. Ry. Co. were issued to E. in part payment of the amounts due under his contract. Before the contract was completed, certain interest on these bonds fell due,

and E., by arrangement with the M. Ry. Co., took up and paid part of the coupons on such bonds out of the proceeds of bonds delivered to him under his contract. *Held*, that E. was entitled to be reimbursed by the K. Ry. Co. for such payments, and the amount received by him under the contract was to be considered reduced pro tanto.

**7. SAME—ENGINEERING—LIEN.**

*Held*, further, that assistant engineers, engaged upon work which, under the contract between the railway company and E., the company was bound to pay for, were entitled to recover the amounts due them directly from the railway company, and to have liens therefor against its property, upon complying with the requirements of the statute as to the steps necessary to secure such liens.

**8. CORPORATIONS—AUTHORITY OF PRESIDENT.**

*Held*, further, that while the contract with E. was in existence, the president of the K. Ry. Co. had no authority, as such, to make a contract which would bind the company, with another person or firm, to do part of the work which E. was bound to do, especially when such other person or firm knew of E.'s contract.

**9. LIENS—PRIORITIES—ALLOWANCE OF INTEREST.**

In the distribution of the proceeds of a common security between liens of different priorities, interest should be allowed upon the superior lien up to the time of satisfaction.

**10. RAILROADS—AUTHORITY TO MORTGAGE—TENNESSEE STATUTE.**

The provisions of the Tennessee statute (Mill. & V. Code, § 1277) requiring notice to be given, by advertisement in certain newspapers, of a meeting of the stockholders of a railroad company at which a mortgage is authorized, is for the protection of stockholders, and, until some stockholder objects to the validity of a mortgage authorized at a meeting which was not so advertised, no other person can object on that ground.

**11. JUDGMENTS—EVIDENCE.**

A judgment against a railroad company for material claimed to be furnished in its construction directly to the company is not evidence that such material was furnished directly to the company, and not to a contractor building its road, as against holders of the bonds of the company, in a cause where the controversy is as to the priority of the lien of the mortgage securing the bonds and a lien claimed by the person furnishing the material.

**12. MECHANICS' LIENS—TENNESSEE STATUTES—SUIT TO ENFORCE.**

Under the statute of Tennessee relative to liens of mechanics and others against railroads (Act 1883, c. 220), an intervening petition, filed by the claimant, in a cause to which the railroad company is a party, claiming a lien, in the alternative, either against the railroad company direct, or through another party to the suit as principal contractor, as the facts might appear, is a sufficient compliance with the requirement of a suit to enforce the lien of a principal contractor.

**13. SAME—ATTACHMENT.**

Under such statute it is not necessary for a claimant to issue an attachment against the property of the railroad company.

**14. SAME—WHAT CONSTITUTES NOTICE.**

Under such statute, a declaration, in a suit by the claimant against the railroad company, served upon such company, and containing a count based upon a subcontractor's lien arising out of a contract with the principal contractor for the construction of the road, is a sufficient notice to the railroad company of the plaintiff's claim of a subcontractor's lien, though the suit is afterwards dismissed by the plaintiff.

**15. SAME—SUIT TO ENFORCE.**

Within the time limited by said statute after serving notice of lien on the railroad company, a subcontractor filed a bill against the railroad company, to which the principal contractor, and all other parties holding liens or mortgages on the road, were made parties, in which he claimed a principal contractor's lien, but averred that, owing to the dealings

between the principal contractor and the railroad company, it was doubtful whether complainant and others engaged in the construction of the road were principal or subordinate contractors, and asked that their liens be declared first liens, or for such other or different relief as might seem meet. *Held*, that the bill might be treated as one to enforce a subcontractor's lien, and hence as a compliance with the statute.

16. COLLECTION OF TAXES—TENNESSEE STATUTE.
    The statute of Tennessee relative to taxation of railroads (Acts 1875, c. 78, Mill. & V. Code, §§ 669–708) provides that state taxes may be collected by the comptroller by distress and sale, and, on failure to obtain satisfaction out of the personal property, by sale of the real property and franchises; and also that the collector of taxes of any county shall collect the amount due to the county as now provided by law, in case of delinquents. *Held*, that these provisions constitute an exclusive mode of collection of railroad taxes, and that as, at the time of the passage of the act, the general tax laws provided no penalty for delinquents, no such penalty could be imposed on a railroad delinquent in payment of taxes, notwithstanding a penalty had been imposed by subsequent legislation for delinquents under the general laws.

17. PRACTICE—ALLOWANCE TO COUNSEL.
    Where a bill has been filed to foreclose a mortgage on a railroad, and persons holding liens on the road afterwards file a general creditors' bill to ascertain and clear all liens on the road prior to the mortgage, making the mortgagees and all other lien holders parties, it being necessary to a successful sale of the property that the various liens should be ascertained and cleared off, and such creditors' bill being consolidated with the foreclosure suit, the plaintiffs in such creditors' bill are entitled to an allowance for counsel fees out of the fund derived from the sale of the road for their services in filing the bill and bringing in all lien claimants.

Appeal from the Circuit Court of the United States for the Northern Division of the Eastern District of Tennessee.

This was a suit by the Central Trust Company of New York to foreclose a mortgage given by the Marietta & North Georgia Railway Company, with which was consolidated a suit by V. E. McBee and others against the Central Trust Company and others to restrain the prosecution of the foreclosure suit and of other claims against the property on which they claimed liens, and praying for a sale and payment of their claims from the proceeds. All creditors were directed to file their claims in the consolidated cause, and numerous lien claimants accordingly filed intervening petitions. A motion to dismiss the bill of McBee et al. for want of jurisdiction was denied. 48 Fed. 243. A decree for sale and distribution was made, from which cross appeals were taken by the Central Trust Company and the lien claimants, and which was reversed on the Central Trust Company's appeal. 16 U. S. App. 115, 6 C. C. A. 539, 57 Fed. 753. After further hearing in the circuit court a new decree was entered, from which both the Central Trust Company and some of the lien holders again appeal.

This is a second appeal in this case. The opinion of the court on the former appeal is reported under the name of Central Trust Co. v. Bridges, 16 U. S. App. 115, 6 C. C. A. 539, 57 Fed. 753. The controversy relates to the priority of liens on a railroad running from Knoxville south towards Marietta, in Georgia, 118 miles, and known at the time of its construction as the Knoxville Southern Railroad. The Marietta & North Georgia Railway Company of Georgia owned a narrow-gauge railroad running north from Marietta towards the North Carolina and Tennessee lines. Persons interested in its stock, especially R. M. Pulsifer and George R. Eager, conceived the plan of making

it a standard-gauge road, and extending its line to Murphy, N. C., and thence to Knoxville, Tenn. Accordingly contracts were made between the railroad company and George R. Eager, by which the latter agreed to carry out the proposed improvement in Georgia as principal contractor, receiving his pay in first mortgage bonds of the company. The mortgage under which these bonds were issued contained a provision that they should be used to pay for the construction of the road in Georgia and North Carolina at not exceeding $16,000 a mile, and in Tennessee at not exceeding $20,000 a mile. The mortgage was executed in 1887, and at that time the Marietta & North Georgia Railway Company had no authority to build or mortgage a railroad in Tennessee. About the same time, however, the same persons organized the Knoxville Southern Railroad Company to build and operate what was intended to be and was the Tennessee extension of the Georgia Company's railroad. The Knoxville Company made a contract in 1887 or 1888 with a corporation of New Hampshire known as the North Georgia Construction Company as principal contractor to build the road in Tennessee. Eager was president of this construction company, and a large owner of its stock. The city of Knoxville agreed to subscribe for $275,000 of the stock of the Knoxville Southern Railroad Company on condition that the railroad should be completed in time to permit the running of trains from Marietta to Knoxville by August 13, 1890. Much work was done on the Knoxville road during the year 1888. From the fall of that year until the spring of 1890 the work was substantially suspended. R. M. Pulsifer, a large stockholder in the railroad company and in the construction company, died late in 1888, and this seemed to stay the further prosecution of the work. The construction company, for all the work it did, received its pay in bonds of the Marietta & North Georgia Railway Company, issued under the mortgage already referred to, although that company did not own the road being constructed, and had no authority to mortgage it. The construction company, in 1889, assigned to Eager all its rights under its contract, and all its liabilities, and in April, 1890, a contract was made between the Knoxville Southern Railroad Company, acting by Arthur, its vice president, and George R. Eager, for the construction of the entire railroad. The contract was dated back to August, 1887, and was thus made doubtless to overreach the time during which the building had proceeded under the contract of the North Georgia Construction Company. This contract was spread on the minutes of the meeting of the stockholders of the Knoxville Southern Railroad Company of May 29, 1890, and was ratified and approved. The contract provided that the Knoxville Company would mortgage its road to secure the bonds of any other company issued to Eager to pay him for the construction of the road. Accordingly, at a meeting of the stockholders of the Knoxville Company of July 14, 1890, the directors and officers were directed to execute a mortgage to the Central Trust Company to secure all the bonds of the Marietta & North Georgia Railway Company issued to pay for the building of the Knoxville Southern Railroad not exceeding $20,000 a mile. The meeting at which the mortgage was authorized does not appear to have been advertised in the Knoxville, Nashville, and Memphis papers. Before August 13, 1890, trains were running from Marietta to Knoxville, and the subscription of the city of Knoxville became absolute, and was paid in bonds of the city. In November, 1890, the Marietta & North Georgia Railway Company and the Knoxville Southern Railroad Company were consolidated, in accordance with the laws of Georgia and Tennessee, under the name of the former company.

In the construction of the Knoxville Southern Railroad, with but one or two exceptions, all the claims of contractors and material men for work done or material furnished before 1890 were paid. When the road went into the hands of a receiver, in January, 1891, there were left unpaid upwards of $300,000 of claims by contractors and material men. Substantially all the contracts under which these claims arose were made after the execution of the contract between Eager and the Knoxville Company in April, 1890, and the work and materials were all furnished thereafter. In October, 1890, Eager became slow in his payments, and suits were begun by subcontractors. Many of these suits were prosecuted to judgment in the state courts of Tennessee against Eager as principal contractor and the railroad company as garnishee. In November, 1890, in a manner described in the opinion on the

former appeal, Eager secured a judgment as principal contractor for $375,000, and subsequently assigned this judgment to S. B. Luttrell, trustee, for the benefit of all the subcontractors and material men to whom he was indebted. Of the men who did work or furnished materials for the construction of the railroad, McBee & Co., J. W. Wilson, W. McD. Burgin, W. B. Crenshaw, J. H. Odell, James H. Moses, and George Bruster were the only lien claimants who did not take judgment against Eager as principal contractor and the railroad company as garnishee in the state courts. On January 12, 1891, the Central Trust Company filed its bill in the circuit court of the United States for the Northern district of Georgia against the Marietta & North Georgia Railway Company to foreclose the mortgage of 1887. The next day a similar and ancillary bill was filed against the same company in the court below, the circuit court of the United States for the Eastern district of Tennessee. The next day, McBee & Co., J. W. Wilson, and W. McD. Burgin filed a bill in the same court to establish their liens against the Knoxville Southern Railroad, to marshal the liens, and to sell the railroad. To this bill they made parties the Knoxville Southern Railroad Company, the Marietta & North Georgia Railway Company, and all the contractors, including Eager, and all the material men having claims against the road, so far as they knew them. They attacked the validity of the mortgages of 1887 and of 1890 and the consolidation. The foreclosure bill and that of McBee & Co. et al. were consolidated, and a receiver was appointed. It was ordered that the McBee bill be treated as a general creditors' bill, and that all persons having claims against the Knoxville Southern Railroad Company be brought in by due advertisement. Subsequently the Central Trust Company filed an amended bill, setting up the Knoxville Southern mortgage of 1890, and praying foreclosure under that. The Central Trust Company and the two railroad companies filed answers to the McBee bill, in which they averred that the work for which liens were claimed had been done for George R. Eager, principal contractor, and not for the Knoxville Southern Railroad Company; and that, as nothing was due from the company to Eager, no lien could be asserted against the railroad. The contract relied on specifically was that dated August 20, 1887, and actually executed in April, 1890. Thus was evolved a controversy, which was referred to a master to hear and determine, between the bondholders on one side and the contractors and lien holders on the other, and in which the main question was whether the work done and material furnished by the lien claimants had been done for George R. Eager, principal contractor, or for the Knoxville Southern Railroad Company. The master reported that, although Eager represented himself to be a contractor, and actually did the work under a contract, his contracts were nevertheless the contracts of the railroad company, because he was the largest stockholder of the company, and the directors were his tools and employés, quick to do his bidding. This view was confirmed by the circuit court, and all the claims were decreed to be liens against the road as principal contractor's liens, and in no way dependent on or limited by the amount owing, if anything, from the railroad company to Eager. In its decision on the former appeal this court differed from the court below and the master, and held that Eager was a principal contractor with the railroad company under the contract dated August 20, 1887, and that all who had taken judgment against him as principal contractor were in fact subcontractors, and could only assert liens as such against the railroad company to the extent of the company's indebtedness to him. This court also held that Eager's judgment against the Knoxville Company was fraudulently obtained, and that it did not furnish even prima facie evidence of the amount due him. The case was accordingly remanded to the circuit court for two purposes: First, for the hearing and determination on further evidence of the amount due from the Knoxville Southern Railroad Company to Eager; and, second, for the hearing and determination on further evidence of the question whether McBee & Co., J. W. Wilson, W. McD. Burgin, W. B. Crenshaw, J. H. Odell, James H. Moses, and George Bruster had contracted directly with the railroad company or with Eager. By consent of counsel, the claim of Kellar & Findlay to the extent of about $1,800, though it had been included in a judgment for a much larger amount against Eager as principal contractor, was resubmitted to the master for decision as to whether this part of their claim was not properly to be treated as a

direct debt of the railroad company. The master reported that the railroad company was not indebted to Eager at all, and that of all the persons whose claims had been referred to him for determination only McBee & Co., and they only to the extent of half their claim, had a valid debt and lien directly against the railroad company. The court below sustained the exceptions to the master's report, and held that all the claimants above named were principal contractors with the railroad company, and that the railroad company was indebted to Eager as follows:

| | |
|---|---:|
| Unissued stock............................................... | $103,020 00 |
| Interest thereon from Jan. 1, 1890, to date of filing bill in this cause ............................................................... | 6,438 75 |
| On account of permanent line around the W................. | 55,145 04 |
| On account of cattle guards, water tanks, and stock gaps..... | 9,850 00 |
| Interest from Aug. 13, 1890, to Jan. 16, '91................. | 245 88 |
| On account of slides........................................ | 14,142 90 |
| On account of expenses of engineering....................... | 51,072 82 |
| Interest from Aug. 13, '90, to Jan. 16, '91................. | 1,276 80 |
| On account of Goodlin lot................................... | 293 01 |
| Interest from Aug. 13, '90, to Jan. 16, '91................. | 7 30 |
| On account of steam shovel.................................. | 5,100 00 |
| Interest from Aug. 13, '90, to Jan. 16, '91................. | 127 50 |
| On account of extra mileage, four side tracks, and "Y"........ | 45,000 00 |
| Interest from Aug. 13, 1890, to Jan. 16th, '91.............. | 1,125 00 |
| Making a total of........................................... | $292,855 00 |

All said items were allowed as proper credits in favor of said George R. Eager, and against the Knoxville Southern Railroad Company; but against said amounts it was adjudged that the said Knoxville Southern Railroad Company was entitled to credits as follows:

| | | |
|---|---:|---:|
| For completion of the bridge over Little Tennessee river ............................................. | $5,500 00 | |
| For strengthening trestle at the W................ | 2,500 00 | |
| For rights of way which are yet unpaid for, and adjudged in this proceeding....................... | 2,142 93 | |
| | | $10,142 93 |
| Leaving a balance of................................ | | $282,712 07 |
| Due to George R. Eager, but from the foregoing sum there was deducted the sum of.............................. | | 27,834 67 |
| Being the amount above adjudged to be due to the said V. E. McBee & Co., James M. Wilson, Wm. McD. Burgin, and Kellar & Findlay, and leaving the final balance due to the said George R. Eager from the Knoxville Southern Railroad of.................................................... | | $254,877 40 |

The decree of the court was appealed from by the Central Trust Company, and many errors were assigned. Cross appeals were taken by the subcontractors from the decree on the ground that the amount adjudged to be owing by the Knoxville Southern Railroad Company to Eager was too small. Another question presented by the record on the Trust Company's appeal is whether, under the railroad tax law of Tennessee, the county and state are entitled to collect 10 per cent. penalty upon the delinquent taxes due from the railroad company.

The contract executed in April, 1890, and dated August 20, 1887, between Eager and the Knoxville Southern Railroad Company contained, among other recitals, this: "Whereas, the Knoxville Southern Railroad Company is desirous of contracting for the making and construction of its railroad, and is willing to that end, in order to accomplish the purpose of its organization, to pledge and employ in the payment therefor all of its property and franchises, and whereas George R. Eager is able and willing to enter into contract for the construction of railroads and other works." The first clause of the contract provided that: "The party of the second part agrees to build

and complete the railroad of the party of the first part, and the party of the first part agrees that the party of the second part shall and may build said railroad, commencing at a point on the south side of the Tennessee river, where the road of the Knoxville Belt Railroad Company and the said road connects, within one mile of the city limits of Knoxville, in the state of Tennessee, to a connection with the Marietta and North Georgia near where the Hiawassee river crosses the North Carolina and Georgia state line, in accordance with the specifications hereto annexed, upon such route as has been or may hereafter be designated by the party of the first part. Second. The party of the second part agrees to furnish the money to pay for right of way, depot grounds, except the terminals at Knoxville, which it may be necessary for the first party to acquire for the convenient uses and operation of the railroad herein agreed to be constructed, and to pay the expenses of all legal or other proceedings that may be necessary therefor. And it is mutually agreed that all works, materials, and plants heretofore constructed, equipped, and provided, either by the party of the first part or by the party of the second part, now in use in or about the construction or operation of the railroad of the party of the first part, as and shall be deemed for all purposes of this agreement, as works, material, or plants heretofore constructed, equipped, or provided under agreement by the party of the second part, provided that the party of the second part shall be at liberty to replace any or all of such works, material, or plant with others conforming to the terms of this agreement, and thereupon such works, material, or plant so replaced by other shall be and remain the property of the party of the second part. Third. The party of the first part agrees, whenever requested to do so by the party of the second part, to survey and lay out its road or roads as hereinbefore agreed to be constructed, and to acquire by purchase or condemnation or otherwise such rights of way, depot grounds, and other real estate as may be necessary or convenient for the construction, use, or operation of the said road or roads." By the fourth clause the railroad company agreed to execute a mortgage to "secure the payment of bonds of the party of the first part, or to secure the payment of bonds of any other company taken or used by the said Geo. R. Eager as a part of his compensation for the building of the road of the party of the first part, or any portion thereof, under this or any contract to the amount of $20,000 per mile for each and every mile of constructed road, and to make and execute any other or further deeds, conveyances, or mortgages or instruments as counsel learned in the law selected by said Eager may advise as necessary or proper to secure any first or other mortgage bonds issued to aid in the construction or equipment of said road, or to pay any expenses connected therewith, or with the management or operation of said road, or with the marketing of said securities." The fifth paragraph provided that: "The party of the first part shall pay to the party of the second part, for the said railroad constructed and to be hereafter constructed by the party of the second part as aforesaid, all the first mortgage bonds of the party of the first part to be issued under or secured by the said mortgage, namely, $20,000 per mile, also full-paid shares of the capital stock of the party of the first part to the amount of $20,000 per mile of said railroad, excepting that there shall be deducted from the total amount of said capital stock such amount thereof as shall be required to be issued to fulfill the terms of the conditional subscription by the city of Knoxville, or any other subscription that may be made to said railroad company by any county or community. The stock herein mentioned shall be paid whenever and as each mile of the road is graded, and the party of the second part shall be entitled to demand, and the party of the first part agrees to deliver to the second party, full-paid capital stock to the amount of $20,000 per mile as each mile is graded. The bonds herein mentioned shall be paid whenever each mile of road is built and ready for the operation of trains." The sixth paragraph of the contract was an assignment by the railroad company of all the stock subscriptions to Eager, and of all the funds in its possession at that time, in further payment of the work and services to be performed. The seventh paragraph provided that the entire railroad contracted to be built should be fully constructed and furnished in accordance with the stipulations, with all the appurtenances therein con-

tracted for, to the party of the first part, before the 13th day of August, 1890. "But the party of the second part shall have the right at any time to deliver to the party of the first part any portion of the railroad or railroads as completed, and, as soon as any portion of the road or roads herein contracted to be built shall be delivered to the party of the first part, the same shall be operated by the said party of the first part, through its officers and agents, to be appointed with the consent of the party of the second part, and the said party of the second part shall receive all the earnings and shall pay all the expenses of operating such completed portion until the entire construction and delivery of the road under the provisions of this agreement."

Butler, Stillman & Hubbard, Henry B. Tompkins, and Tillman & Tillman, for Central Trust Co.

W. L. Ledgerwood, for state of Tennessee and Monroe county.

W. P. Washburn and Jerome Templeton, for McBee & Co. et al.

Green & Shields, J. W. Caldwell, and Templeton & Cates, for interveners.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Of the questions left open by the decision on the former appeal, the principal one now to be determined is that of the amount owing by the Knoxville Southern Railroad Company to George B. Eager. The first important point of difference between the parties is in respect to the liability of Eager under the contract to furnish the railroad company with a complete equipment of rolling stock. The master reported that Eager was bound to supply rolling stock, and that, not having done so, he was chargeable with the sum required for the purpose. The circuit court sustained the exception to this view, and held that the contract did not impose such an obligation on Eager. We concur with the court below. In the recital the desire of the railroad company to contract "for the making and construction of its railroad" is referred to. In the first clause Eager agrees to build and complete the railroad, and the company agrees that he may build it according to specifications (which never appear to have been made). In the second and third clauses reference is made to the "railroad herein agreed to be constructed." By the fifth clause the payment under the contract is to be for the railroad "constructed and to be hereafter constructed," and the bonds which constitute the final payment are to be paid "whenever each mile of road is built and ready for the operation of trains." These expressions are utterly inconsistent with the idea that Eager was bound to furnish the rolling stock in addition to completely constructing the road. The second half of the second clause inserted manifestly for the purpose of merging the contract of the North Georgia Construction Company in this one of Eager does refer to "all works, materials, and plants heretofore constructed, equipped, and provided, now in use in or about the construction or operation of the railroad," but this clause does not necessarily include rolling stock, though it may not necessarily exclude it. Rolling stock is usually not

referred to either as "works" or "plant" or "materials." Works and plant which must be furnished in the building of a road are as necessary in the operation of the road as rolling stock, so that "operation" does not necessarily imply that the works, plant, or materials referred to were rolling stock. In the fourth clause of the contract the company agrees to execute a mortgage to secure the bonds to be issued as compensation for Eager's building the road, and also to issue additional mortgages necessary to secure any first or other mortgage bonds issued to aid in the construction or equipment of the road. Just what the bonds were which the additional mortgages were expected to secure is not quite clear. Certainly so obscure a sentence cannot be held to impose on Eager an obligation to equip the road, when the clause in which his obligations are defined excludes such an idea. But it may be suggested that the feature of the contract by which all the available assets of the company were to be delivered to him to pay for his work, leaving nothing to the company to buy rolling stock, made it reasonable and probable that he should furnish the rolling stock, and requires this effect to be given to the contract, if possible. This road was built as an extension of the Marietta & North Georgia Railway, with an immediate consolidation in view, and it would not be unreasonable to suppose that the parties to this contract looked to the latter road for aid in this respect. The agreement in the fourth clause of the contract that the company would give an additional mortgage to secure bonds issued to aid in the equipment of its road suggests that the parties then had some plan for the issuance of other bonds by the Marietta & North Georgia Railway to pay for equipment of this road, also to be secured by mortgage on this road. However this may be, the court cannot disregard the plain limitations imposed by the language used, and expand an agreement to build and construct into an agreement to construct and furnish rolling stock.

The main argument of counsel for the trust company is based on the language of the certificates of the chief engineer of the Marietta & North Georgia Railway Company upon which Eager obtained his bonds from the Central Trust Company and an agreement for the negotiation and sale of the bonds between one Hambro and the Marietta & North Georgia Railway Company represented by Eager in which it was provided that bonds should be delivered by the trust company at the rate of $20,000 per mile only on the presentation of such certificates. The certificates were to the effect that five miles of road had been constructed, and the necessary and proportionate amount of rolling stock had been furnished. We do not see how the Hambro agreement and the certificates of the engineer of the Marietta & North Georgia Railway Company can vary the construction of the contract between Eager and the Knoxville Southern Railroad Company. The latter was not a party to the Hambro agreement, and its engineer did not issue the certificates. It only bound itself to secure by mortgage on all its property the bonds issued for its construction.

It may be that, as between himself and the bondholders under the Marietta & North Georgia mortgage, Eager, if he had furnished equipment, would be estopped to assert title to it, or a claim for it in priority to the mortgage; but such an estoppel, arising de hors the written contract between him and the Knoxville Southern Railroad Company, could not affect his subcontractors and the material men. Green v. Williams, 92 Tenn. 220, 21 S. W. 520. They had the right to rely on the contract as defining the extent of Eager's lawful claims against the Knoxville Southern Railroad Company, and as furnishing the fund for the payment of their liens, when duly fixed in accordance with the statute. The contract was their security. Bullock v. Horn, 44 Ohio St. 420, 7 N. E. 737. Whether this contract dated August 20, 1887, is one which might have been set aside as not securing to the Knoxville Southern Railroad Company that which in good conscience it should have had because of Eager's fraud and undue influence in obtaining it, is a question not before us for decision. It is the contract upon which both the railroad companies and the Central Trust Company have planted themselves in their pleadings, and it is the contract upon which this court has supported their claim that Eager was the principal contractor, and that all the other claimants were subcontractors under him. The Central Trust Company cannot use the contract for one purpose and repudiate it for another. The contract provided that the bonds should be paid when each mile of road was built and ready for the operation of trains. By its terms Eager agreed to construct the railroad, not to equip it. The construction of the road does not include its equipment, and any such interpretation of the contract would be making a new agreement.

It is said, however, that the circuit court of appeals of the Fifth circuit has decided in the case of Central Trust Co. v. Hiawassee Co., with respect to a similar contract, that Eager was obliged to furnish the equipment. The case is reported in 2 U. S. App. 1, 1 C. C. A. 116, 48 Fed. 850. An examination of the opinion does not bear out what is claimed for it. The controversy there arose over the title to certain rolling stock between Eager's assignee and the bondholders. It appeared that Eager had furnished the rolling stock to the Marietta & North Georgia Railway Company, and that on the faith of the company's owning it Eager had obtained the bonds under the Hambro agreement. It was held, although his contract with the railroad company might not have required him to furnish the equipment, that, as against the bondholders, he, and therefore his assignee, were estopped to assert title to the rolling stock, and defeat the lien which the bondholders would have on it as the property of the railroad company. The controversy there was, of course, very different from here, and has no bearing upon the question at bar.

The second important question with reference to the indebtedness of the company to Eager is whether he can claim any recovery now for the deficiency in the amount of stock in the Knox-

ville Southern Railroad Company which should have been issued to him under the contract. We had occasion to consider this claim in our first opinion. The judgment of $375,000 in favor of Eager was founded on an agreement arrived at in the stockholders' meeting of the Knoxville Southern Railroad Company, wherein Eager and all the other lien claimants were represented, by which agreement the value of $300,000 par value of the shares of the capital stock of the Knoxville Southern Railroad Company was fixed at $275,000. This was at a meeting on the 29th of November, 1890. We held in the former opinion that the amount of stock due to Eager was at the time worthless, and that the fixing of its value at $275,000 was a mere fraudulent device to make Eager's claim against the company sufficiently large to pay all the subcontractors under him, and fasten a lien to that extent upon the corpus of the railroad company, prior to that of the bondholders. It now appears that the deficiency in stock due to Eager was more than $600,000, instead of $300,000. He had already received, however, $1,500,000 par value of the stock. The court below, overruling the master, who found the claim for stock to be worthless, held that Eager was entitled to this stock on the 1st of January, 1890; that at that time its value was 15 cents upon the 100, and that Eager should be allowed a credit of $103,020 therefor. We think this finding cannot be supported for several reasons. First, there is no sufficient evidence in the record to show that the stock had any market value on the 1st of January, 1890. That which was introduced to show it, was of a very flimsy character. More than this, it is by no means clear that on the 1st of January, 1890, Eager, who, at that time had 12,000 shares of the stock, had graded more than 60 miles of the road. Under the contract, therefore, he had all the stock he was then entitled to. Again, Eager made no demand upon the company for the stock, and was not entitled to recover in damages, except from the time he made his demand, and such demand was refused. When he did make a demand, in November, 1890 (if it can be treated as a demand in good faith), it is conceded that the stock was absolutely worthless. But it is said that the capital stock of the company was only $1,500,000, so that the company on January 1, 1890, was not able to issue the stock, and therefore a demand was not necessary. The charter provided that the capital stock might be increased by a vote of the directors, and there is nothing to show that, if Eager had requested the increase of the stock, the directors and stockholders would not have secured such increase by amendment of the charter, or such other step as might be necessary. On the contrary, it is manifest that they would have done so if Eager had really in good faith requested it.

The next item in the claim of Eager against the company is on account of the permanent line around the W. The railroad company, in order to secure certain subscriptions, was obliged to complete its line and have trains running upon it from Marietta, Ga., through to Knoxville, on the 13th day of August, 1890. Part

of the Knoxville Southern Railroad lay through and over mountainous country.   In crossing Bald Mountain it was found that the work of constructing an easy grade would consume more time than could be given if the subscription contract with the city of Knoxville was to be fulfilled.   It was therefore deemed best to build what was called a "W," and at some later period to construct a permanent line on easier grades.   The W was accordingly constructed, and Eager received his pay by mileage upon that line, but he also constructed about one-third, or three miles and a half, of a permanent line, which would give the company a much easier mode of getting around Bald Mountain.   He never has received any pay for the part of the permanent line which he built.   This will be of great advantage to the company and to the purchaser at the foreclosure sale.   It is now in the hands of the receiver, and the title to the right of way is in the Knoxville Southern Railroad Company, or its grantee, the new Marietta & North Georgia Railway Company.   It must be presumed that so much of the permanent line as was built was built with the consent of the railroad company, and that the change from the permanent line to the W was with its acquiescence.   Clearly, the permanent line around the W must be treated as an extra not paid for by bonds delivered under the contract.   We think that it is such an addition to the value of the railroad company, over and above the line which Eager agreed in his contract to build, that he ought at least to have credit for its actual cost.   It is a part of the railroad, and, when completed, will be part of its main line. The amount due for its actual cost is $55,145.04.

A credit for cattle guards, water tanks, and stop gaps, amounting to $9,850, was allowed by the court below to Eager, but these, we think, were all a part of the complete construction of the railroad, for which Eager was paid in the bonds delivered to him under his contract.   The same is true of slides.   It may be that, where a contractor is building for a railroad company certain work, under carefully drawn specifications, and there are unusual slides, it is customary to allow him for the same; but the present is an unusual contract.   It covers the complete construction of the road, and the company places everything in the hands of Eager to assist him, and gives him the widest discretion in reference to the way in which he shall build the road.   In such a case we think it reasonable to hold that he assumes the additional cost arising from natural causes.

The next item is that of the expenses of engineering.   There is nothing in the contract imposing upon Eager the duty of paying the expenses of the engineering of the road.   The railroad company had a chief engineer duly appointed, and it had four or five assistant engineers under him, whom Eager paid.   The services which they rendered were services which would ordinarily be paid by a railroad company in the construction of a railroad, and there is nothing in the contract to show that it was expected that Eager should meet these expenses.   He did meet them be-

cause the company had no funds to draw upon at the time, but we think that under the contract he may be properly credited with the amount paid by him therefor. This sum is $51,072.82. It was paid out of the proceeds of the bonds delivered to him in fulfillment of the company's contract with him, and may be fairly said, therefore, to reduce the amount actually paid him for his work by the company.

It is conceded that on account of the Goodlin lot there is $293.01 due to Eager.

The court below allowed $45,000 for side tracks and Y's built by Eager, on the theory that under his contract he was entitled to $20,000 per mile of track laid in their construction. The master reported that their actual cost was but $16,000, and that he was inclined to the opinion that they were properly a part of the completed road which Eager was bound to construct. Eager's contract was to build a completed road, ready for the operation of trains. Y's are but the equivalents of turntables, and are thus indispensable in the operation of a railroad. It is impossible to run trains upon a single-track railroad, 100 miles long, without side tracks. We are satisfied from the evidence that both the Y's and the side tracks were only part of the necessary construction of the completed road, and were paid for by the bonds delivered to Eager at the rate of $20,000 per mile of main track. There were no specifications, and he took a lump job for a completed road. Under these circumstances, the item for side track and Y's cannot be allowed.

A claim is made on account of a steam shovel, of $5,100, which was in the possession of the railroad company when this suit was begun, and passed thence into the hands of the receiver. Eager would have no claim against the company on construction account for such a shovel, and could certainly not claim any lien under the statute against the company for furnishing it. The statute allows liens only for work of construction and materials therefor, and for engineering and superintendence, but not for tools or machinery for construction. Mill. & V. Code, § 1774. If Eager delivered this shovel to the company, its delivery simply created a debt which was not a debt of construction, and could not give rise to a lien.

In addition to the foregoing items a claim was made before the master and before the court below in favor of Eager for the amount paid by him to take up and cancel interest coupons upon the bonds of the Marietta & North Georgia Railroad Company. The amount claimed was $164,000. It was disallowed both by the master and the court below. It is brought here for our consideration by cross appeal and proper assignment of error. As has already been stated, the Knoxville Southern Railroad Company was an extension of the Marietta & North Georgia Railroad Company. The Marietta & North Georgia Railroad Company issued all the bonds for the construction of both roads at the rate of $20,000 per mile for the construction of the Knoxville Southern and at

a somewhat less rate per mile for the construction of the Marietta & North Georgia Railroad. In the issuance and delivery of the bonds to Eager under the Knoxville Southern contract, the Marietta & North Georgia Company really acted as the agent of the Knoxville Southern Railroad Company. While Eager was building the Knoxville Southern Railroad the interest upon the bonds of the Marietta & North Georgia Railroad Company began to fall due. By agreement between the president of the Marietta & North Georgia Railroad Company and Eager, the latter took up, paid, and canceled all the interest coupons of the bonds which were presented for payment. The coupons thus falling due, and which might have been presented for payment, amounted in all to $164,000. As a matter of fact less than this number were presented; how many less the record does not definitely show. It does appear from the record, however, by Bradley's testimony, exactly how many interest coupons Eager paid and canceled of those bonds which were delivered to him under the Knoxville Southern Railroad contract, to wit, $36,290.01 down to July 1, 1890. This sum Eager testifies was paid out of the proceeds of the bonds for the construction of the Knoxville Southern Railroad Company. We do not think that Eager is entitled upon his Knoxville Southern Railroad contract to credit for interest paid by direction of the Marietta & North Georgia Railroad Company on bonds issued by that company, and not used in the construction of the Knoxville Southern Railroad. Such payment was made under what must be regarded as an independent agreement, by which an indebtedness was created in favor of Eager against the Marietta & North Georgia Railroad Company. But we do think that there may be properly credited to Eager on his Knoxville Southern contract the sum paid by him under direction of the agent of that company out of the proceeds of the bonds delivered to him to take up coupons on previous bonds delivered to him under the same contract. These interest coupons were obligations of the Knoxville Southern Railroad Company, and a contract between the agent of that company and Eager, by which the latter paid them out of the proceeds of new bonds, reduced pro tanto the amount paid to Eager under the contract for the construction of the road.

There are other items, some of which were allowed to Eager by the court below and others of which were rejected. We think that they were all for work required of Eager under the contract, and cannot be made the basis for any claim in his favor against the railroad company.

Eager must be debited with the amount required to elevate the bridge over the Little Tennessee river; also for the amount required to strengthen the trestles built by him, and for the amounts due for rights of way which in his contract he agreed to pay for and did not, and which are adjudged in these proceedings against the railroad company and in favor of the owners. The account would therefore stand as follows:

v.67 f.no.1—7

### Credits.

On account of the permanent line around the W..................\$ 55,145 04
On account of engineering........................................ 51,072 82
On account of Goodlin lot........................................   293 01
On account of interest coupons on bonds......................... 36,290 01

                                                            \$142,800 88

### Debits.

To amount required to elevate Little Tennessee river
  bridge .....................................................\$5,500 00
To amount required to strengthen trestles............ 2,500 00
To amount required to pay for rights of way adjudged
  in these proceedings against the R. R. Co............ 2,142 93
                                                       ————— 10,142 93

Balance due Eager.......................................\$132,657 95

These matters constituted a running account between Eager and the railroad company, and, in view of the fact that he did not really complete all the work under his contract until about December 15, 1890, we do not think that interest should be calculated on the balance until that date. The amount due to Eager is the fund out of which his subcontractors who have perfected liens are to be paid. This was the limit in the aggregate of subcontractor's liens upon December 15, 1890. They were liens superior to the bonds. They should bear interest, or, what is the same thing, the fund from which they are payable should bear interest until paid. The security and priority of the lien attach as well to interest as to principal. The aggregate of the subcontractor's claims exceeds by at least 50 per cent. the fund due Eager, even with interest, so that in the distribution no interest need be calculated on the claims after December 15, 1890, for the share applicable to each will not be varied by adding interest to all claims for the same period from December 15, 1890, to the date of the decree. But the limit in the aggregate of the liens fixed on the property must be increased by interest until satisfaction. This is not a case where the distribution is to be made pro rata between the lienholders and the bondholders, in which case, of course, interest is not to be calculated upon the claims after the time of the sequestration of the property for sale and distribution, so long as the claims cannot be paid in full. Bank v. Armstrong, 16 U. S. App. 465, 8 C. C. A. 155, 59 Fed. 372. In the distribution of the proceeds of a common security between liens of different priorities, we know of no principle by which interest can be stopped on the amount of the superior lien until its satisfaction. As between the bondholders and the lienholders, the lienholders are entitled to interest to the day of payment, and the decree should therefore include interest on the amount herein found due Eager from December 15, 1890, until it shall be entered.

We come now to the claims made by McBee & Co., J. W. Wilson, W. D. McD. Burgin, Kellar & Findlay, W. B. Crenshaw, J. H. Odell, J. H. Moses, and George Bruster. These claimants aver that they dealt directly with the Knoxville Southern Railroad

Company, and that they are entitled to liens as principal contractors for the work which they did, or the material which they furnished, directly against the railroad without regard to the indebtedness of the railroad company to Eeager. With respect to Crenshaw, Odell, Moses, and Brusier, we think they may properly recover the amounts due them directly from the railroad company. They acted as assistant engineers under Walton, the chief engineer of the company. They sue for their salaries as such. The amount which they did receive was paid, it is true, by Eager, but we have found that it was the duty of the company, under the contract, to pay the engineering expenses. In paying and employing these men, therefore, Eager was not arranging and paying for work to be by him done under the contract, but he was pro tanto acting as agent for the company in arranging and paying for work which was imposed by the contract on the company. The amounts due to these four claimants are not disputed, and they are entitled to interest on the same from the time they became due until the date when the decree shall be entered below. It is objected that these assistant engineers have not taken the necessary statutory steps to perfect their liens as principal contractors. The statute (Acts 1883, p. 296, c. 220; Mill. & V. Code, § 2774) gives a lien on the railroad for engineering and superintendence, which is to continue in force for six months after the performance of the work, and until the termination of any suit commenced within the time for its enforcement. Section 2 provides as follows:

"That the lien created under section 1 of this act may be enforced by a suit against the railroad company in the circuit court of the county or district where the work or some part thereof was done, or the material or some part thereof was delivered. The plaintiff shall set out in his declaration, with reasonable certainty the work done, the amount of indebtedness claimed therefor, and the nature and substance of the contract, and such suits shall be docketed and conducted as other suits in said court."

The work of engineering done by these claimants was continued nearly to January, 1891. On April 13, 1891,—within six months thereafter,—they filed petitions in this cause, to which both the railroad company and Eager had already been made parties. Crenshaw's petition, of which those of the other three are duplicates, was as follows:

"Your petitioner, W. B. Crenshaw, a citizen of Knox county, Tennessee, which is in the Northern division of the Eastern district of Tennessee, respectfully shows to the court that the Knoxville Southern Railroad Company, a body corporate, and a defendant herein, is justly indebted to him in the sum of $716.39, with interest from January 15, 1891, as follows: Said Knoxville Southern Railroad Company, as shown by the bill filed in these causes, undertook to construct, and did construct, between the 23d day of August, 1887, and the 1st of January, 1891, a line of railroad extending in a southeasterly direction from Knoxville, in Knox county, Tennessee, in the Northern division of the Eastern district of Tennessee, to Blue Ridge, Georgia. The contract for the construction of the entire line of said road, which was about 100 miles in length, was let by said company to its codefendant, George R. Eager, as principal contractor. Your petitioner is a civil engineer by profession, and as such was employed under said Eager for the performance of professional work, and did perform professional work as such civil engineer.

during the construction of said line of railroad, and for said work said railroad company and said principal contractor became indebted to petitioner in a considerable sum of money, and are indebted to him for said service in the amount above shown. Petitioner shows that he has made demand upon said company and upon said Eager for the payment of said sum, and by both of them payment has been refused. On the 15th day of January, 1891, complainant, according to the statutes of Tennessee, filed his notice of lien against said Knoxville Southern Railroad Company, and he will exhibit the original notice, with the acknowledgment of service by said company thereon, in the progress of this cause, if the same shall be needed or called for. Petitioner is advised that he has the right to come into this cause, and to be made a party thereto, for the purpose of setting up and proving his claim. He is further advised that his said claim constitutes, under the statutes of Tennessee and the laws of the land, a lien upon said Knoxville Southern Railroad, superior to all claims except those which are, by the statutes of Tennessee, expressly made equal to it. He is advised that said lien is superior to all claims, except claims for work and labor done and material furnished to said railroad company or said principal contractor, and is of equal dignity and effect with all claims of the kinds last named. Petitioner is advised that his lien exists, whether said Eager was really principal contractor for said railroad company or not, and he prays that your honors will so determine and decree, in view of the fact that his work and labor was done in the construction of said railroad. He prays that he may have a decree for the amount above shown to be due him, and that said decree declare his said claim to be a lien upon said Knoxville Southern Railroad, and that said lien be enforced by your honors by proper orders and proceedings."

The petition was evidently framed in the alternative to establish a lien in favor of the petitioner, either as principal or subcontractor, as the court might determine that Eager had been agent of the company, or merely a contractor in employing the petitioner. We have found that in employing and paying the engineers, Eager was merely acting for the company, and not as a contractor, and therefore conclude that this petition must be construed to be an intervening suit to establish a principal contractor's lien against the railroad in the custody of the court, and that it is sufficient for the purpose. It follows that Crenshaw, Odell, Moses, and Bruster must be decreed to have liens on the proceeds of sale for their claims and interest from January 15, 1891, the date of the receivership to the date of the decree.

McBee & Co. were a firm composed of V. E. McBee and J. W. Morgan. They did bridge-building work on the Knoxville Southern Railroad under two contracts. One was a contract for the construction of the bridge over the Little Tennessee river, for which they were to be paid at a certain price per lineal foot of material used; and the other was a contract under which they did all bridge work assigned them, in consideration of the payment of the men employed, the furnishing of the material, and a certain stipulated salary to Morgan for superintendence. Both McBee and Morgan state that the original contracts were made by them with Eager, but they say that they thought he was the president of the Knoxville Southern Railroad Company, and that he gave them to understand that he was dealing with them in this capacity. Their evidence upon this point is obscure and labored. McBee testifies that shortly after the oral agreements Eager sent him a written contract for signature, in which Eager,

and not the railroad company, was named as the party of the first part; that he at once sent the contract back to Eager by his secretary, Foster, with directions to decline signing a contract made with any one but the railroad company. Foster says that he went to Eager with the contract, and stated this as McBee's chief objection; that he made an interlineation in lead pencil in the proposed contract, striking out Eager's name as a party, and inserting that of the Knoxville Southern Railroad Company; that Eager readily consented to the change, and the interlined typewritten draft of the contract was left with him to prepare a new one. Eager denies ever representing to McBee that he was the president of the railroad company, and says that it was distinctly understood between them that he was dealing with them as principal contractor. He denies that either McBee or Foster ever objected to contracting with him as such. He says, and it otherwise appears, that he never filled any office in the Knoxville Southern Railroad Company. Moreover, he produces the letter of McBee, acknowledging the receipt of the draft of contract, McBee's letter which Foster brought with him when he came to object to the form of the contract, and the original draft of the contract, with Foster's lead-pencil interlineations. From these it appears beyond controversy that McBee received the form of contract on the 14th of May; that he did not return it by Foster until about the middle of July; that in the letter returning it he complained, not that the contract was with Eager, but only that the specifications were burdensome; and, finally, that the interlineations made by Foster in the contract not only did not involve a substitution of the railroad company for Eager as a party, but that in one of them Foster had written the name of Eager as such party. The case made by the testimony of McBee and Morgan is so shattered by this documentary evidence as seriously to impair the credibility of their statements with reference to a subsequent conversation held by them with W. B. Bradley, president of the Knoxville Southern Railroad Company, in which they say Bradley, on behalf of the railroad company, in consideration of their not withdrawing their men from the unfinished bridge, agreed that the railroad company should be directly liable to them for the amount due and to become due. Bradley was at the same time president of the Knoxville Southern Railroad Company and superintendent of construction under Eager. On the 30th of October, 1890, McBee, Morgan, and one McNeely, a stenographer of McBee, went to see Bradley about their pay. Bradley says that he told them that Eager was then in the East for the purpose of raising funds. He denies that he ever said to them that the railroad company would see to it that they were paid. McNeely, one of McBee's witnesses, says that by direction of McBee, without Bradley's knowledge, he took notes of the conversation, and had them when examined in chief, but before his cross-examination he had lost them. It further appears that some weeks after this Morgan signed a receipt for about $3,000 as a payment on account by George R. Eager, contractor, and that he had signed a similar receipt in the

previous July. In addition, there are produced in evidence accounts for work, presented by McBee & Co.'s timekeeper, against the North Georgia Construction Company, Eager's predecessor as principal contractor, as late as December, 1890. The master reached the conclusion that McBee's original contracts were with Eager as principal contractor, but that Bradley did give McBee to understand that the railroad company would see his firm paid. Were the question material, we should have difficulty in supporting the latter finding, for the circumstances strongly corroborate Bradley, and impeach McBee and Morgan. But it is not necessary for us to decide the point. The master reported that Bradley, as president, had no authority as president, by agreement or otherwise, to impose on the railroad company Eager's obligations under the McBee contract, and in this we fully concur. The board of directors had made a contract with Eager for the complete construction of the road, as McBee and Morgan well knew, and such a contract necessarily excluded any authority on Bradley's part to make a new contract for part of the same work with some one else. It is true that in some cases the contract of the president of a railroad company is held binding upon the company, though no express authority be shown, because from the performance of it by the other party to the benefit of the company, and within the knowledge of the directors, without objection by them, their acquiescence is presumed. Pennsylvania R. Co. v. Keokuk & Hamilton Bridge Co., 131 U. S. 371, 9 Sup. Ct. 770; Indianapolis Rolling-Mill v. St. Louis, Ft. S. & W. R. Co., 120 U. S. 256, 7 Sup. Ct. 542. Here, however, the work was presumably done by subcontract with Eager; therefore no presumption of acquiescence by the directors in a new contract with McBee & Co. could be indulged. The master, while finding that Bradley had no authority to make a new contract with McBee & Co., nevertheless held the company liable for the work done after the conversation of October 30th on principles of estoppel. We cannot concur in this result. There was no holding out by the railroad company that Bradley had authority to make such a contract. Indeed, as already stated, McBee knew that Eager was the principal contractor, and might well infer that Bradley had no power to make the company liable for what was due only from Eager. For these reasons, we conclude that McBee & Co. were only subcontractors under Eager. The master reported the amount due to McBee & Co. on their contracts to be $18,615.87, with interest from December 16, 1890, while the court below found the amount to be $23,187.44. The discrepancy arises chiefly from the fact that the court allowed McBee & Co. the freight on material used by them from the point of purchase, while the master held that they were only entitled to free transportation from the termini of the railroad under construction. We think the master was clearly right. There is substantially no competent evidence to sustain the claim that the freight beyond the termini of the road was to be borne by Eager. McBee's claim must therefore be reduced to the amount found by the master.

The next claim is that of J. W. Wilson. He was chief engineer of the Knoxville Southern Railroad from 1887 to May 21, 1890, when he was succeeded by Walton. He did substantially no work as such after the fall of 1888. He did, however, buy ties, which were used in the construction of the railroad company. These ties were furnished before his resignation as engineer. He says that he furnished these ties to the company, and not to Eager, and that he never heard of Eager as contractor until a short time before trains were running on the road. He is manifestly mistaken in his evidence. As many as three bills for ties presented by Wilson to Eager, as principal contractor, and receipts of money from Eager as such in payment of them signed by Wilson, are produced in evidence. They leave no doubt that in selling ties he was dealing with Eager, and not with the railroad company. It is said, however, that Wilson has recovered a judgment against the railroad company, as principal contractor, for the full amount of his claim. This is true, and, though the judgment was rendered by default, there was no fraud in the procuring of it, and it is therefore conclusive upon the railroad company. The judgment is not, however, evidence of any indebtedness against the railroad company, such as to give Wilson's claim priority of lien over the bonds in a controversy with the bondholders. This is settled by the case of Hassall v. Wilcox. 130 U. S. 493, 9 Sup. Ct. 590. Reference was made to this case in the previous opinion in disposing of the claim that Eager's judgment was conclusive upon the bondholders. With respect to Eager's judgment, it was not found necessary to apply the principle announced in the case of Hassall v. Wilcox, because the circumstances under which Eager's judgment had been obtained were so plainly fraudulent as to make it not even conclusive against the railroad company. It was then contended on behalf of those lien holders who had taken judgment in the state courts that Hassall v. Wilcox did not apply in this case, because the mortgage to the bondholders had not been issued in accordance with the statutes of Tennessee, and did not confer upon their trustee the legal title. The objection to the validity of the mortgage was that notice of the meeting of the stockholders at which it was authorized had not been advertised in the newspapers at Memphis, Nashville, and Knoxville, as required by the General Statutes of Tennessee (Mill. & V. Code, § 1277), under which the issuance of mortgages by railroad companies is authorized. Section 1277 is as follows:

"Railroad companies existing under the laws of this state, or of this state and any other state or states, whose original charter of incorporation was granted by this state, are empowered to issue bonds, and secure the payment thereof by mortgage upon their franchises and property in any state, or upon any part of such franchises and property, or to issue income or debenture bonds and such guaranteed, preferred and common stock as may be determined upon by the stockholders; provided, the same be approved by the votes of the holders of three-fourths in amount of the entire stock of said company at a regular or called meeting of the stockholders of said company; and that sixty days' notice be given in a Memphis, Knoxville and Nashville daily newspaper of the time, place and purpose of the meeting."

We are clearly of opinion that the provision as to notice is for the protection of the stockholders, and that, until some stockholder objects to the validity of the mortgage on the ground that he had no notice of the meeting and its object, this cannot be used by other persons to invalidate it. It appears by the record that at the time the mortgage to the Knoxville Southern road was made there were 12,051 shares represented at the meeting out of a total of 12,053. For this reason we think the mortgage or deed of trust given did confer the legal title upon the Central Trust Company as trustee. It therefore follows from Hassall v. Wilcox that Wilson's judgment against the railroad company, to which the Central Trust Company was not a party, does not bar the trust company, as mortgagee and trustee for the bondholders, from contesting the validity of his claim against the railroad company, so far, at least, as to defeat its priority as a lien over that of the bonds.

Burgin's claim is for work done in 1888–89 in the construction of the Knoxville Southern Railroad. The documentary evidence shows beyond a doubt that he did this work for the North Georgia Construction Company, and not for the railroad company.

Nor is there any doubt that Kellar & Findlay were knowingly rendering their services as subcontractors to Eager as principal contractor. The evidence is overwhelming upon this point, and they reduced their entire claim to judgment against Eager as principal contractor, and the railroad company as garnishee, in the state court. Their claim was really covered by the decision of this court on the former appeal, and it has only been re-examined on this appeal by consent.

A careful review of all the evidence presented at the former appeal and of that adduced on the second hearing below strongly confirms the conclusion announced in our former opinion that the work of constructing the Knoxville Southern Railroad was done under the North Georgia Construction Company and George R. Eager as principal contractors, and that no work of any kind except the engineering was done for the railroad company on direct contracts with the railroad company. The evidence to the contrary consists chiefly of opinions and impressions of interested witnesses, whose memories are shown to be defective by the uncontrovertible documentary evidence produced from the records of Eager's office and of the railroad company.

Having thus decided that McBee & Co., Wilson, Burgin, and Kellar & Findlay were subcontractors under George R. Eager, principal contractor, it remains to consider whether they have taken the proper steps under the Tennessee statute to fix their liens as such. Eager recovered a judgment against the railroad company for $375,000 in a suit to enforce his lien as principal contractor. He assigned that judgment to S. B. Luttrell, trustee, for the equal benefit of his subcontractors and material men. In our former decision we held that this judgment was fraudulently procured, and could not be even prima facie evidence of the validity of such a claim in this suit. To the extent to which

we have upheld Eager's claim in this case, we may concede, without deciding, that Eager and his assignee might avail themselves of the formal steps taken by him to fix his lien under the statute, and therefore that he would be entitled to a principal contractor's lien for the amount already found due to him, and thus, that his subcontractors, as beneficiaries under his assignment to Luttrell, might share the benefit of his lien, whether they took the necessary statutory steps to fix their liens as subcontractors or not. But a subcontractor's lien under the statute is not dependent on the principal contractor's having perfected his lien. Green v. Williams, 92 Tenn. 220, 21 S. W. 520. It is independent of and superior to his lien, and is only limited by the amount due to the principal contractor at the time of the service of notice by the subcontractor on the railroad company. Therefore the assignee of a principal contractor's lien is junior to the subcontractor who has perfected his statutory lien. The claims of the subcontractors who have perfected their liens in this case far exceed in the aggregate the amount due to Eager, and therefore he could take nothing by his lien, and could pass nothing by the assignment of it to Luttrell. It follows that only those subcontractors can share in the fund due from the railroad company to Eager who took the necessary statutory steps to perfect their liens.

The third section of the railroad lien act of 1883 provides that the subcontractor, in order to secure a lien against the railroad company, "may give notice in writing to the railroad company, setting out the work done or material furnished, and the amount claimed therefor, and thereupon the amount that may be due or owing from the railroad company to the principal contractor (not exceeding the sum claimed) shall be bound and liable in the hands of the railroad company for the payment of the amount so claimed, and shall constitute a first lien in favor of the claimant, superior to all other liens upon the company's railroad, and shall continue in force for a period of ninety days from the date of service of such notice, and until the termination of any suit commenced within that time to enforce it. * * * The claim provided for in this section may be enforced against the railroad company as garnishee, and the principal contractor as debtor in the circuit court." Of the four claimants whose liens are under consideration, Kellar & Findlay filed a notice with the railroad company, and seasonably began suit in the state court, and took judgment for their entire claim against Eager as the principal debtor and the railroad company as garnishee. They therefore are entitled to share in the fund found due to Eager as principal contractor, with the many persons who, as subcontractors, took similar judgments in the state courts, and whose names are given in the decree of the court below from which this appeal is taken. It is objected, however, both against Kellar & Findlay's rights to a subcontractor's lien and against all but one of the subcontractor lien claimants below, that their liens have not been perfected because an attachment was not issued against the property of the railroad company during the suit. This objection applies to all the lien claim-

ants except the South Tredegar Iron Company, which did issue an attachment both against the property of Eager and that of the railroad company. But it is untenable. The statute does not provide that an attachment shall issue in suits to enforce railroad liens. It is true that under the mechanic's lien law of Tennessee (Mill. & V. Code, § 2747) the lien must be enforced by attachment, but this is because the section expressly requires it. Dollman v. Collier, 92 Tenn. 660, 22 S. W. 741. There is no such provision in the railroad lien law. The lien of the principal contractor is to be enforced merely by suit, and the form of the declaration is prescribed in the statute. The lien of the subcontractor may be enforced by suit against the principal contractor as principal debtor and against the company as garnishee. But there is not a suggestion in the statute that attachments are necessary to the perfecting of the lien. We think, therefore, that all who took judgments in the state courts against Eager as principal debtor and the company as garnishee have valid liens as subcontractors, and are entitled to share pro rata in the amount found due from the company to Eager.

A more difficult question remains for decision. It is whether McBee & Co., Wilson, and Burgin have taken the necessary steps to secure a subcontractor's lien for the amount found due them from Eager. McBee & Co.'s work was not completed until December, 1890. On December 31, 1890, their counsel filed with the railroad company the following notice:

"To the Knoxville Southern Railroad Co.: You are hereby notified that we, the undersigned firm, have a balance due us. of the sum of twenty-one thousand one hundred and fourteen and 84-100 ($21,114.84) dollars due by account for material furnished and labor done in building the bridge of said railroad across the Little Tennessee river; said railroad being the same constructed by you from Knoxville, Tennessee, southwardly through the counties of Knox, Blount, Monroe, McMinn, and Polk, to the line between Tennessee and Georgia, and we rely on our lien under sections 2774–2783, inclusive, of the Mill. & V. Code of Tennessee, as security for said money. We claim to have been in said work contractor with you, but give this notice because we understand you claim we are subcontractors under George R. Eager, and that said sum is due from him as principal contractor. In any event, we look to you for payment.

"This Dec. 31, 1890.                              V. E. McBee & Co.
                                        "(V. E. McBee.  J. W. Morgan.)
                                   "By Washburn & Templeton, Attys."

On January 2, 1891, they filed a suit in the circuit court of Monroe county, Tenn., against the Knoxville Southern Railroad Company. There were two counts in the declaration. The first was based on a contract averred to have been made directly with the railroad company, and the second count was based on a subcontractor's lien averred to have been made with Eager as principal contractor. The second count further averred that the company was largely indebted to Eager. Eager was not made a party to this suit. In January, 1893, the suit was finally dismissed at plaintiff's costs. It is probable that such a suit could not now be relied on to preserve the lien, because it was dismissed, and because Eager was not a party to it, as the statute seems to require. But

certainly, if the notice of December 31, 1890, quoted above, was not sufficient, the second count of the declaration would serve the purpose of the notice, and was a compliance with the statute in this regard. By the terms of the statute, the fund then owing from the railroad company to Eager became bound to McBee & Co. by the service of the notice, and the lien, by virtue of the statute, was then fixed to continue for 90 days, and to be prolonged thereafter by a suit brought within the 90 days to enforce it. The question remains, therefore, was such a suit brought by McBee & Co.? It must be a suit to enforce the subcontractor's lien, and must, of necessity, make the principal contractor a party. The bill of McBee & Co. in the court below was filed January 15, 1891, within 90 days from the foregoing notices. It averred that the Knoxville Southern Railroad Company was indebted to the complainant, McBee & Co., for work and material furnished directly to the company. It further averred that Eager occupied various capacities in relation to the Knoxville Southern Railroad Company, being at one time its principal contractor, and at another time its agent, at another time its president; and that it was matter of doubt whether the persons engaged in the construction of the road, and whose claims were unpaid, were creditors of Eager or creditors of the railroad company. The bill attacked the validity of both mortgages; asked that all the persons having claims for work and material furnished in the construction of the road be made parties defendant; that Eager, who had recovered a judgment against the road for $375,000 for work and material done by him in the construction of the road, be made a party, and that he be compelled to set up the contract, if any existed between him and the railroad company. The Marietta & North Georgia Railroad Company and the Central Trust Company were also made parties. By an amended bill complainants reiterated the averments of their original bill, and further charged that Eager was the Knoxville Southern Railroad Company, and that all contracts made with him were made with the Knoxville Southern Railroad Company, and therefore that all persons furnishing work and material to him were entitled to claim as principal contractors. The prayer of the bill was that the claims of the complainants and all the creditors made defendants should be adjudged to be first liens on the property of the railroad company, that the mortgages to the trust company should be set aside and held to be invalid, and "for all such other further and different relief" as might seem meet and proper to the court. The answers of the two railroad companies and the trust company denied the invalidity of the mortgages, averred that Eager was a principal contractor, and that all the material claimed to have been furnished by complainants and the other intervening lien claimants had been furnished to him as principal contractor, and were claims against him, and not the company. While the bill and amended bill in terms charged that the debts for which liens were asked had been contracted directly with the railroad company, we are of opinion that, taken in connection

with the notice already served upon the railroad company by Mc-Bee & Co., which notice is referred to in the bill, the difficulty set forth in the bill of determining whether Eager was principal contractor or not, the fact that Eager was made party to the bill, and finally the prayer for all other and different relief which might seem proper to the court, the bill may be treated as a suit in the alternative either to enforce a principal contractor's lien, or, if that should not be upheld, then to enforce a subcontractor's lien. Certainly, upon such a bill and such a prayer, the circuit court may, under the liberal rules of equity practice, adjudge and enforce a subcontractor's lien in favor of complainant without requiring an amendment of the bill. If so, then it is clearly a suit to enforce a subcontractor's lien, for otherwise the court could not enforce it. Moreover, we think this conclusion to be in accordance with the liberal construction which the supreme court of Tennessee has placed upon all proceedings under the lien laws in favor of the meritorious contractor. Reeves v. Henderson, 90 Tenn. 521, 18 S. W. 242. Analogous cases may be found in Pomeroy v. Lumber Co., 33 Neb. 240, 44 N. W. 730; Buckley v. Taylor, 51 Ark. 302, 11 S. W. 281; and Reed v. Norton, 90 Cal. 590, 26 Pac. 767, and 27 Pac. 426. For these reasons we hold that McBee & Co. did perfect their lien and bring suit within the required time to enforce it, and that they are now entitled to share in the fund found due to Eager, as subcontractors.

With respect to Wilson's claim, we cannot find that he is entitled to a lien as subcontractor. The ties which he seeks to recover pay for were furnished before his resignation as chief engineer on May 21, 1890. There is no express limitation in the statute for the filing of notice by the subcontractor with the railroad company of his claim against the principal contractor. The limitation is upon the time within which suit must be brought after the filing of such notice, to wit, 90 days. It would seem, however, to be an indispensable step under the statute that such a notice shall be filed by the subcontractor with the railroad company before any claim for a subcontractor's lien can be asserted. Wilson filed no notice of any kind with the railroad company, and we must therefore hold that he did not perfect his lien as subcontractor in accordance with the statute.

The question whether McBee & Co., Wilson, and McD. Burgin have perfected subcontractors' liens is not one which affects the bondholders in this case. The fund out of which all the subcontractors are to be paid is the fund due to Eager, and the distribution thereof is a matter of indifference to the bondholders. The question is one which only affects the other subcontractors who have perfected their liens. Each of them is entitled to object to any other person's sharing in the fund who has not taken the steps which the statute prescribes for the fixing of such a lien. When, therefore, it appears that Wilson did not file any notice with the railroad company of his claim as a subcontractor, it becomes impossible to sustain his lien as such. His claim is a meritorious one, and we regret the necessity of a ruling which shall exclude

him from a share in the fund for subcontractors. The same result must be reached with reference to Burgin. Burgin's work was all done in 1888 and 1889. For more than 18 months he took no steps whatever to perfect either a principal or subcontractor's lien. He filed no notice of any kind with the railroad company, and cannot be allowed to share in the subcontractors' fund.

Reference is made in the brief of counsel for the trust company to the alleged error of the master and the court below in allowing certain right of way claims reduced to judgment in favor of Dunn & Patty and Hegdon & Chastain. There is no sufficient assignment of error to require our examination of the validity of these claims, but, even if there were, we think that the court below properly allowed them.

A question presented on this appeal is whether, under the tax laws of Tennessee, applicable to railroads, the state and the county are entitled to collect 10 per cent. penalty because of the delinquency of the railroad company in paying the taxes admitted to be due. The collection of delinquent taxes on railroad companies is regulated by chapter 78, Acts 1875, p. 100, entitled "An act declaring the mode and manner of valuing the property of railroads for taxation and the amendments thereto," which are codified in chapter 5, tit. 5, pt. 1, Mill. & V. Code, §§ 669–708, inclusive, entitled, "Of the assessments and taxation of railroad companies." After the special provisions for assessing railroad property, section 704 provides as follows:

"The taxes so assessed in behalf of the state shall be due as other taxes, and if the same be not paid to the comptroller within the time allowed other taxpayers he shall proceed to collect the same in the manner following: He shall issue a distress warrant against the company for the amount thereof, to any sheriff in the state, whose duty it shall be to levy the same upon any personal property of the company to be found in his county, and sell the same as other property of like character is sold for taxes.

"No. 705. In the collection of said taxes, the comptroller is hereby empowered to do all acts and things, which any collector of revenue is authorized to do by law; and should he fail to realize the taxes and costs from the sale of personal property or otherwise, he is authorized and empowered to expose to public sale to the highest bidder, all the property of such defaulting railroad company lying and being in this state, together with its franchises after giving thirty days notice of the time and place of sale in some newspaper published in the city of Nashville; and to make a deed of conveyance thereof to the purchaser.

"No. 706. It shall be the duty of the governor to issue his warrants to any of the sheriffs along the line of said railroad, authorizing and commanding the sheriffs to put such purchaser into full and complete possession of such road and all its property and the sheriff shall execute the same.

"No. 707. The collector of taxes for any county shall collect the amount due to the county as is now provided by law in case of delinquents."

We think this is an exclusive mode prescribed by statute for the collection of railroad taxes. The comptroller of the state is authorized, when he cannot collect the taxes by the sale of personal property without judicial process, to expose the realty to public sale to the highest bidder, and to make a deed of conveyance thereof to the purchaser. For delinquent county taxes the collector was required to collect the amount due the county "as is now provided by law in

case of delinquents." This refers us back to the general tax laws which were in force at the time of the enactment of the railroad tax law, and it is conceded that there was then no statutory provision for penalties of any sort on delinquent taxes, or for the payment by the delinquent of the fees of the collector in addition to the tax. The use of the word "now" prevents us from giving an ambulatory construction to the reference to the general tax laws, and from holding that every amendment of the general tax law respecting the collection of taxes must effect an amendment in the railroad tax law. It follows that, although at present, under the general tax laws, 10 per cent. penalty is imposed for delinquent taxes, and although there may be no good reason for distinguishing between taxes to be collected from railroads and those from other taxpayers, we are limited by the language of the statute, and must decide that there is no authority for imposing a 10 per cent. penalty on delinquent railroad taxes. The state comptroller is given power to enforce the collection of state taxes against railroads without judicial process, and this may explain why it was not thought necessary to provide a penalty for delinquent railroad taxes, it being supposed that by the extraordinary remedy afforded him he could prevent any such delinquency. It is true that the remedy cannot be enforced so long as roads are in the possession of receivers of the federal courts, but this was a defect in the statute, which the legislature has thus far failed to remedy, and which we cannot supply. The assignment of error by the trust company to the allowance by the court below of this 10 per cent. penalty must be sustained.

Error is assigned to the following clauses in the decree of the court below.

"It is further ordered and decreed by the court that the bill of V. E. McBee & Company and others is an original bill, and the same is declared to be a general creditors' bill, and that the prosecution of the suit of the Central Trust Company was properly enjoined under the same, and that the complainants in said bill No. 922, and all the interveners whose claims are above set forth, are entitled to have the Knoxville Southern Railroad sold in said cause of V. E. McBee & Company and others. * * * It is further adjudged and decreed that the counsel representing the claimants in the original bill of V. E. McBee & Company et al. vs. Knoxville Southern Railroad Company et al., viz. Washburn and Templeton, are entitled to compensation out of the general fund arising from the sale of said road for their services in bringing said railroad to sale, and administering the assets of said insolvent railroad company, and a lien is declared upon said fund in their favor; but the amount of said compensation is left unadjudicated, to be fixed and determined after the sale of said railroad shall have been reported to the court."

We see no error in these provisions. The bill of the trust company was merely a bill to foreclose a mortgage. It was indispensable to a successful sale of the property that it should be cleared of the liens growing out of its construction. The complainants who filed the creditors' bill and brought in all the lien holders did a work in the administration and distribution of the assets of the railroad company beneficial to all concerned. For services in filing the bill, therefore, and bringing in all lien claimants, it was not im-

proper for the court to order a fee paid to complainants' counsel out of the fund realized from the sale. Trustees v. Greenough, 105 U. S. 527; Railroad Co. v. Pettus, 113 U. S. 116, 122, 5 Sup. Ct. 387; Hobbs v. McLean, 117 U. S. 567, 582, 6 Sup. Ct. 870; Dodge v. Tulleys, 144 U. S. 451, 12 Sup. Ct. 728; Meddaugh v. Wilson, 151 U. S. 333, 14 Sup. Ct. 356. But the compensation must be limited to the service in filing the bill and assembling the creditors. After the creditors were brought in, two hostile camps were formed, the bondholders in one and the lien claimants in the other. Services rendered by counsel in the litigation thereafter, in which the case, after two trials below, has been brought twice to this court, must be paid for by their own clients, and not by the bondholders.

This naturally brings us to the question of costs. As we have sustained assignments of error on the appeal and the cross appeal, we shall divide the costs of appeal between the bondholders on the one hand and the lien claimants as a class on the other. The half to be paid by each side shall be deducted from the fund awarded to them from the proceeds of sale before distribution. The order with respect to the costs in the court below will be that each party shall pay his own costs. All costs incurred in the bringing in of defendants and the service of process upon them shall be taxed to the proceeds of sale. The compensation of the special master shall be paid one-half by the bondholders and one-half by the lien claimants out of the funds awarded to the two sides respectively, before distribution. The expenses of the receivership and the sale must, of course, be paid from the general fund arising from the sale.

We have been asked to prepare the decree in this court for entry in the court below, but this is impracticable. We have considered all the assignments of error to the decree appealed from, and we hope we have made this opinion sufficiently specific to render easy the drawing of a proper decree. The decree of the circuit court is reversed, with instructions to enter the same decree, modified in accordance with this opinion.